UNITED STATES *v.* HARPER.

(*Circuit Court, S. D. Ohio, W. D.* October Term, 1887.)

1. BANKS AND BANKING—NATIONAL BANKS—EMBEZZLEMENT—REV. ST. U. S. § 5209.

To constitute the crime of embezzlement under Rev. St. U S. § 5209, defining the offense of embezzlement of the funds of a banking association by its officers, it must appear that the moneys or funds embezzled came lawfully into the possession of defendant, and were, while so held by him, converted to his own use, with intent to defraud the bank. But such possession need not be exclusive. It is sufficient if the business or assets of the association were actually or practically intrusted to his care and management, so that by virtue of his office he had not merely access to, or a constructive holding of, such funds, but such actual possession, though concurrent with others, as enabled him to have and exercise control over the same that would place him in the lawful possession of such funds.

2. SAME.

Under an indictment for embezzlement of the funds of a banking association by its officer, it is not necessary that the jury should find that the exact sum stated in the indictment was embezzled. It is sufficient if they find that defendant embezzled any of the funds or assets of the said association.

3. SAME—NATIONAL BANKS—MISAPPLICATION OF FUNDS—REV. ST. U. S. § 5209.

To constitute the crime of willful and criminal misapplication of the funds of a national bank by its officers, as defined by Rev. St. U. S. § 5209, it is not

necessary that the accused should have been previously in the actual possession of such funds under or by virtue of any trust, duty, or employment; nor is it necessary that he derive any personal benefit from the transaction. It is sufficient if the misapplication is made by him, or by some one under his direction and control, either for his benefit or the benefit of some one other than the association, with the intent to injure or defraud the association.

4. SAME.

Under an indictment for the willful and criminal misapplication of funds of a national bank by its officer, containing several special counts charging particular acts of misapplication, to sustain a verdict on the specific counts the particular acts must be proven as alleged; but the proof of other acts than alleged may be included in the verdict on the general count.

5. SAME—NATIONAL BANKS—ABSTRACTING FUNDS—REV. ST. U. S. § 5209.

To constitute the crime of willfully abstracting the funds of a national bank by its officer, defined in Rev. St. U S. § 5209, it must appear that the funds were withdrawn by the accused without the knowledge or consent of the association, and converted to the use and benefit of defendant or some one other than the association, with the intent to injure and defraud the association. No previous lawful possession of the funds is necessary, nor is it material by what means the abstraction is effected. It may be done by one act or series of acts, or by fraudulent schemes under the color of loans, discounts, checks, or entries.

6. SAME—NATIONAL BANKS—MAKING FALSE ENTRIES—REV. ST. U. S. § 5209.

The crime of making false entries by an officer of a national bank, with the intent to defraud, defined in Rev St, U. S § 5209, includes any entry on the books of the bank which is intentionally made to represent what is not true or does not exist, with the intent either to deceive its officers or defraud the association. The crime may be committed personally or by direction, and it is immaterial that the act was not done in a skillful manner, or that the falsity could be easily detected by inquiry or by examination of other books.

7. SAME — NATIONAL BANKS — CRIMES BY OFFICERS — INTENT—REV. ST. U. S. § 5209.

In Rev. St. U. S. § 5209, defining the crimes of embezzlement, etc., by bank officers, with intent to defraud, the intent to defraud does not mean malice or ill will, but such intent to defraud as may be inferred from the willfully and knowingly doing that which is illegal, and which, in its necessary and natural consequence, must injure another It may be shown or may be conclusively presumed from the doing of the wrongful, fraudulent, or illegal act.

8. SAME.

Directors or the managing committee of a national bank may, in the honest exercise of official discretion, make loans or discounts for the actual or supposed benefit of the association, and, although the transaction may be injudicious, and actually result in loss or damage to the bank, there is no criminal liability so long as their acts are not in bad faith, for the purpose of personal gain or private advantage of the officials.

9. SAME—NATIONAL BANKS—CRIMES BY OFFICERS—EFFORTS TO ATONE FOR.

On the trial of an indictment for the misapplication of bank funds by its officer, the defendant offered to show that certain misapplications were made for the purpose of trying to secure the bank against losses through former misapplications. *Held* irrelevant, as the defendant could not condone the former offenses by his subsequent efforts to make good the loss.

10. CRIMINAL LAW—INSTRUCTIONS—REASONABLE DOUBT.

"Reasonable doubt," as employed in criminal law, is an honest, substantial misgiving generated by the insufficiency of the proof; not a doubt suggested by the ingenuity of counsel or jury, unwarranted by the testimony, nor one born of a merciful inclination to permit the defendant to escape, nor one prompted by sympathy for him or those connected with him.

Indictment under Rev. St. U. S. § 5209. On charge to the jury.

The defendant, Edward L. Harper, was vice-president and director of the Fidelity National Bank, of Cincinnati, Ohio, and was indicted for violation of section 5209, Rev. St. U. S. The indictment contained 57

counts, and charged the defendant with embezzlement, willful misapplication of three millions of the funds, assets, and credits of the bank, which were recklessly and unlawfully invested in margins and wheat options in Chicago; with causing false and fraudulent entries to be made on the books of the bank; with issuing without authority of the directors fraudulent certificates of deposit; and with the abstraction of a million dollars of its bills receivable.

*William B. Burnet,* U. S. Atty., *J. E. Bruce,* Asst. U. S. Atty., and *Henry Hooper,* for the Government.

*Charles H. Blackburn* and *Moses F. Wilson,* for defendant.

JACKSON, J., (*orally charging jury,* SAGE, J., *concurring.*) In order that you may be the better able to apply the facts established by the proof to the law governing this case, it is proper that the court should first give you some brief explanation or definition of the several offenses with which the defendant stands charged, before referring to the testimony relating to the several transactions embraced in the indictment, on which the defendant, Edward L. Harper, is being tried. He is charged with having done various acts, and committed various offenses, as vice-president, director, or agent of the Fidelity National Bank, of Cincinnati, Ohio, in violation of section 5209 of the Revised Statutes of the United States, which provides as follows:

"Sec. 5209. Every president, director, cashier, teller, clerk, or agent of any association who embezzles, abstracts, or willfully misapplies any of the moneys, funds, or credits of the association, or who, without such authority from the directors, issues or puts in circulation any of the notes of the association, or who, without such authority, issues or puts forth any certificate of deposit, draws any order or bill of exchange, makes any acceptance, assigns any note, bond, draft, bill of exchange, mortgage, judgment, or decree, or who makes any false entry in any book, report, or statement of the association, with intent, in either case, to injure or defraud the association, or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of such associations; and every person who with like intent aids or abets any officer, clerk, or agent in any violation of this section, shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years, nor more than ten."

The first, third, and fourth clauses of the statute describe several distinct and separate acts, which are made misdemeanors when committed by any president, director, cashier, teller, clerk, or agent of any national banking association. It is unnecessary to notice or enumerate all the different acts which the section describes and makes criminal. It will be sufficient to direct your attention only to those offenses with which the defendant stands charged. The indictment, while containing a large number of counts, charges the defendant with only five of the criminal acts enumerated and described in the statute. He is charged with having embezzled, with having willfully misapplied, and with having abstracted the moneys, funds, and credits of the Fidelity National Bank, and converted the same to his own use; and with having issued and put in circulation certificates of deposit, without the authority of the directors

of the bank, with intent to injure and defraud the bank; and with having made, or caused to be made, false entries on the books of said bank, with intent to deceive its officers, and to defraud the association while he was acting as vice-president and director of the same. Each of these acts is made a separate and distinct offense under section 5209, which I have just read.

As there is only a single charge relating to the first of said offenses,—the crime of embezzlement,—that will be first noticed. By the second count of the indictment it is charged in substance that the defendant was vice-president and agent of the Fidelity National Bank of Cincinnati, an association duly organized and established under the laws of the United States, and doing a banking business in the said city of Cincinnati; that at various times between the first of October, 1886, and the twentieth of June, 1887, the said defendant as vice-president, director, and agent as aforesaid, "did, by virtue of such employment, and while so employed as aforesaid, receive and take into his possession large sums of money and funds of the aforesaid Fidelity National Bank, and which he held for and in the name of and on account of said association, and that he did unlawfully embezzle and convert to his own use certain portions or parts of said funds, moneys, and credits of the said association, to-wit, $2,000,000, with the intent there and then and thereby to injure and defraud the said Fidelity National Bank," etc. This is a sufficient description of the offense. The term "embezzle," as used in this count of the indictment, and in the statute, is a word having a technical meaning, which the court will endeavor to explain, so that you may the better determine whether the proof before you brings the defendant's act or acts within the scope of that meaning. The crime of embezzlement is a species of larceny. It is especially applicable to the unlawful conversion of property by clerks, agents, and servants, acting in fiduciary or trust capacities, and, under the statute above quoted, by a president, director, cashier, teller, clerk, or agent of any national banking association. It involves two general ingredients or elements—*First*, a breach of trust or duty in respect to the moneys, properties, and effects in the party's possession, belonging to another; and, *secondly*, the wrongful appropriation thereof to his own use. In order to constitute this crime it is necessary that the property, money, or effects embezzled should have previously come lawfully into the hands, possession, or custody of the party charged with such offense; and that, while so in his possession and custody, held for the use and benefit of the real owner, he wrongfully converted the same to his own use. In other words, there must be an actual and lawful possession or custody of the property of another, by virtue of some trust, duty, agency, or employment, committed to the party charged; and, while so lawfully in the possession and custody of such property, the person must unlawfully and wrongfully convert the same to his own use, in order to commit the crime of embezzlement. The difference between the crime of embezzlement and that of larceny may serve to better illustrate what is required to constitute the former offense. In larceny there is the ingredient of an unlawful taking from the possession of the

owner with the intent to deprive him of his property, and to wrongfully appropriate the same to the use of the party so taking. The custody or actual possession in larceny is acquired by the party unlawfully, in the act of feloniously taking the owner's property without his consent. But in embezzlement there is no wrongful or unlawful acquisition of the custody or possession of the property embezzled; on the contrary, the party embezzling must be lawfully in possession by virtue of some employment, trust, or agency, under and with the consent of the owner, and while so in possession, holding the property in trust, or for the benefit of the owner, he wrongfully converts the same to his own use. A few practical illustrations may serve better to explain the offense of embezzlement. If your clerk,—a clerk in your store.—within the line of his employment, sells your goods to a customer, and receives the price therefor, and, while holding the money thus received, even on his way to deposit it in the cash-drawer or to deliver it to his employer, he converts it to his own use, or any portion thereof, this would constitute embezzlement. Now, if after having received the money from a customer, the clerk should deliver it over to his employer, or cashier authorized to receive it for him, and should thereafter secretly take the same identical money from the employer's pocket or the cashier's drawer, with the intent to appropriate it to his own use,—that would be larceny. You send your hired man to the city or depot with a load of corn; the property is yours, but it is lawfully for the time being in the possession of the hired man as your agent, to hold and deliver for you, for your use and benefit, according to your directions; instead of executing his duty, he converts or appropriates all or any portion of the corn to his own use,—this would be embezzlement. If he should surreptitiously take from your crib corn, with the possession of which he had not been previously intrusted, his offense would be larceny. If the general book-keeper of a bank, having no general or special custody or possession of the funds of the bank, secretly takes from the safe or drawer of the receiving or paying teller moneys of the bank, with the intent to appropriate the same to his own use, he commits an act of larceny. If, however, the teller—receiving or paying teller—in whose custody the moneys of the bank are placed by virtue of his employment or duty takes the same amount from his drawer, and converts the same to his own use, he would commit the crime of embezzlement. These instances will serve to illustrate the principle which you should keep in mind and apply in considering the charge of embezzlement against the defendant.

It must appear from the evidence that the moneys, funds, credits, or assets of the association, alleged to have been embezzled, were, previously to their wrongful appropriation, lawfully in the possession and custody of the defendant, and that they were, while so held by him, wrongfully converted to his own use. It is not, however, necessary that he should have been in the exclusive custody or possession at the time of the conversion to his own use, in order to constitute this offense. If the evidence establishes that the business and assets of the bank were actually or practically intrusted to the care and management of the defendant, so

that, by virtue of his position as vice-president, director, or agent, he had not merely access to, or a constructive holding of; but such actual custody of the funds, moneys, and credits of the association as enabled him to have and exercise control over the same, that would place him in the lawful possession of said funds or other property; and if, while so lawfully in possession of such assets, funds, and credits, or other property committed to his care and custody for the benefit of the bank, he wrongfully converts any part or portion of said assets to his own use, with intent to injure or defraud the association, he would thereby commit the offense of embezzlement. If his position and employment gave the defendant a superior or a joint and concurrent possession with subordinate employes or agents of the bank, that would be sufficient to place him in such lawful possession as would enable him to commit the crime of embezzlement in relation to assets of the bank so committed to his keeping. If, for example, his position and employment in the bank gave the defendant a joint or concurrent possession and custody of the bank's moneys, funds, and credits with the teller, cashier, or other officer, this would constitute lawful possession on his part for the benefit of the association equal with that of such teller, cashier, or agent; and if, while so lawfully in possession, either alone or jointly with other officers or agents of the bank, he wrongfully converts said funds or assets to his own use, with intent to injure or defraud the association, he would thereby commit the offense of embezzlement. If, therefore, any property of the bank, whether consisting of money, funds, credits, bills receivable, or other assets, are shown by the proof to have been in the defendant's possession, as aforesaid in his official character as vice-president, director, or agent of the Fidelity National Bank, so that he held the same for and on acccount of or in trust for the benefit of said association; and if it is further shown to your satisfaction beyond a reasonable doubt, that, while holding such moneys, funds, or other property under and by virtue of his said official position, employment, or relation to the bank, the defendant wrongfully and intentionally converted the same or any portion thereof to his own use, with intent to injure or defraud the bank, he would be guilty of the crime of embezzlement.

You are not required to find that the exact sum or amount stated in this count of the indictment was embezzled. If, under the circumstances and conditions already mentioned, you find that the defendant converted to his own use moneys, funds, or assets of the bank, no matter how small the amount may have been, it will be sufficient to sustain a verdict of guilty under this count. Nor are you required in your verdict to specify the exact amount so embezzled.

The defendant is next charged with the crime of issuing and putting in circulation certain certificates of deposit, without the authority of the board of directors of said banking association. The fifth and sixth counts of the indictment charge the defendant with wrongfully issuing two certificates of deposit for $200,000 each, on April 28, 1887, to the order of E. Scofield, cashier of the First National Bank of New York city, without authority from the directors of the Fidelity National Bank; that, with

the intent to convert the same to his own use, benefit, and gain, he caused said certificates to be forwarded to said First National Bank, well knowing that said bank had not, in fact, made any such deposit, nor given any consideration to the Fidelity National Bank for the same; that he then and there procured a loan from the First National Bank on said certificates of deposit, without the authority of the board of directors of the said Fidelity National Bank, which he converted to his own use with intent to injure said association. The statute makes it a criminal offense for the president, vice-president, director, cashier, teller, clerk, or agent of any national banking association to issue or put in circulation certificates of deposit without authority from the directors, with intent to injure or defraud the association as herein charged. If, therefore, it is shown by the proof that the defendant issued and put in circulation, or caused to be issued and put in circulation, the two certificates described, without the authority of the directors, for the purpose and with the intent alleged, he would be guilty of the offense described in the statute.

We next come to the charges in relation to misapplication. The first, third, fourth, seventh, eighth, fifteenth, thirty-second, thirty-fourth, thirty-fifth, thirty-seventh, thirty-eighth, thirty-ninth, fortieth, forty-first, forty-second, fifty-second, fifty-third, fifty-fourth, and fifty-sixth counts of the indictment, as it now stands, are for various offenses of willfully misapplying the funds of the bank. They charge, in substance, that the defendant, as vice-president and director of the Fidelity National Bank, duly organized under the laws of the United States, did, in October, 1886, and at various times between that date and June 20, 1887, at the place and in the manner therein stated, willfully and unlawfully misapply the moneys, funds, and credits of said association without the knowledge and consent of the directors thereof, and with intent to convert the same to his own use; that such willful misapplication by the defendant consisted in paying and causing to be paid to C. J. Kershaw & Co., Irwin, Green & Co., Wilshire, Eckert & Co., J. W. Hoyt, and others, the moneys, funds, and credits of the bank, to be used by said parties for his benefit as margins on large wheat purchases made for his account in the city of Chicago; and that said funds, moneys, and credits were so willfully misapplied by him with intent to injure or defraud said bank. The first of these counts is general, and charges the willful misapplication of the bank's money to the extent of $3,000,000, for the purpose therein stated. The others, relating to this offense, charge specific and particular misapplications. They are too numerous to be specially noticed in detail. The *willful* and *criminal misapplication* of the funds of a national bank by its officers, as defined by section 5209, does not include every case of *wrongful* application of such funds. There are some unlawful applications of the moneys and credits of a national bank which are not criminal, and are not included in the statute on which the present indictment is based. For example, the statute relating to national banks provides that the amount borrowed from an association by any person, corporation, or company shall at no time exceed the one-tenth part of the capital stock

of said association actually paid in; and that no association shall make any loan or discount on the security of the shares of its own capital stock, or be the purchaser or holder of such shares, unless such security or purchase shall be necessary to prevent loss on a debt previously contracted; and that no association shall purchase or hold real estate; except for certain specified purposes. Now, if the directors of a national bank should permit an individual or company to borrow at one time more than one-tenth of its capital stock actually paid in, or should purchase its own stock, or real estate, contrary to the provision of the law, such acts and expenditures would be an unlawful or unauthorized application of the funds of the association. The remedies provided by the law for such wrongful expenditures or unauthorized use of its own funds, although made for the account and benefit of the bank, are a forfeiture of all the rights, privileges, and franchises of the association, and the personal liability of every director who participated in or assented to said use of the bank's funds for all damages the association, its shareholders, or any other person may sustain in consequence of such unauthorized application. But such acts are not criminal offenses. These unlawful applications and expenditures which only involve civil liability do not constitute willful and criminal misapplications, as described in section 5209, under which the defendant stands indicted. The willful misapplication which is made a criminal offense by that section of the statute means a misapplication knowingly and designedly made by the officer charged, *for his own use and benefit;* or *for the use and benefit of some person or company other than the association* whose funds, moneys, or credits are taken. To constitute this crime of willfully misapplying the moneys, funds, and credits of a national bank, there must be, therefore, a wrongful appropriation or conversion by the officer charged to his own use, or to the use of some one *other than the association,* with intent to injure or defraud the association or some other person or company. In all the counts of the indictment relating to this offense the defendant is charged with willfully misapplying the funds, moneys, and credits of the Fidelity National Bank without its knowledge and consent, or without the knowledge and consent of its board of directors, by converting the same to his own use, in the manner already stated, and with intent to injure and defraud said association. In order to constitute the offense of misapplication, it is not necessary, gentlemen of the jury, that the accused should have been previously in the actual possession of such moneys, funds, and credits under or by virtue of any trust, duty, or employment committed to him. The statute makes it a criminal offense for any president, cashier, teller, clerk, or agent of a national bank to willfully misapply its assets. Such willful misapplication may be either for his own use, or for the benefit or advantage of some company or person *other than the association.* It is not necessary to the commission of this offense that the officer making the willful misapplication should derive any personal benefit from the transaction. When the funds or assets of the bank are unlawfully taken from its possession, and afterwards willfully misapplied by converting them to the use of any person other than

the bank, with intent to injure or defraud, the offense as described in the statute is committed. This criminal act may be done directly and personally by the accused, or it may be done indirectly through the agency of another. If the officer charged has such control, direction, and power of management by virtue of his relation to the bank as to direct an application of its funds in such manner and under such circumstances as to constitute the offense of willful misapplication, and actually makes such direction, or causes such misapplication to be made, he is equally as guilty as if it was done by his own hands. If, therefore, it is shown by the proof, beyond a reasonable doubt, that the defendant, as vice-president or director of the Fidelity National Bank, did willfully misapply moneys, funds, or credits of the association, as described and charged in the several counts of the indictment relating to that subject, by paying or causing such funds, moneys, or credits to be paid to others for his use or benefit, or for the use or benefit of others for his account, or as margins in the purchase of wheat, or otherwise, without the knowledge and consent of the bank or of its board of directors, and with intent to injure or defraud the association, he is guilty of the offense as charged. The particular acts of misapplication described in the several specific counts must be established by the proofs as therein respectively charged. If, however, there are any willful misapplications shown by the evidence which are not covered by the special and specific counts, they may be included in the first general count, and a verdict rendered thereon accordingly.

We come now to the offense of abstraction. The forty-fourth and fifty-first counts of the indictment charge the defendant with the offense of willfully abstracting the funds and assets of the Fidelity National Bank. The general averments of these two counts relating to the organization of the bank under the laws of the United States, the place where its business was conducted, the defendant's connection therewith as vice-president and director, the times and places when and where, and the manner in which the offenses were committed, are substantially the same as in the count relating to the offenses of embezzlement and willful misapplication already noticed, and need not, therefore, be again repeated. It is then charged that the accused wrongfully and unlawfully abstracted the moneys, assets, and credits of the bank, and converted the same to his own use, without the knowledge or consent of the association, and with intent to injure and defraud it. In considering this charge it is proper to state that the term "abstract," as used in section 5209, has no technical meaning like the word "embezzle," but is employed in the statute, and is to be understood, in its ordinary and popular sense, as taking or withdrawing from; so that to abstract the moneys, funds, credits, and assets of a national bank by any of its officers named in the act, is to take or withdraw the same from the possession or control of the association. But the mere taking or withdrawal of its funds or moneys or other assets from the bank's possession is not in and of itself alone sufficient to constitute the criminal offense of abstraction which is described in the statute. It must further appear, in order to complete the offense, that

this taking or withdrawing was without the knowledge and consent of the association, and that the funds and assets so taken and withdrawn were converted to the use, benefit, and advantage of the officer or agent of the bank abstracting the same, and with intent to injure, or defraud, or deceive, as indicated in the statute. The essential ingredients which go to constitute the criminal offense of abstraction, are, therefore—*First.* The defendant's official relation to the bank as vice-president and director; *second,* the taking or withdrawing by him, or by his direction, of the moneys, funds, credits, or assets of the association; *third,* that such taking or withdrawal was without the knowledge or consent of the bank, or of its board of directors; *fourth,* that the money or effects so taken and withdrawn from the possession of the bank were converted to his own use, or to the benefit and advantage of some person other than the association; and, *fifth,* that this was done with intent to injure and defraud the association. All these elements, which must co-exist to constitute the crime of abstraction described in the statute, are contained in the two counts under consideration; and if they are established by the proof to your satisfaction beyond a reasonable doubt, you should find the defendant guilty as therein charged. No previous lawful possession, as in the crime of embezzlement, is necessary in order to the commission of this offense; nor is it material by what means, contrivances, or devices the abstraction of its funds from the possession of the bank is effected and accomplished. It may be done by one act or a succession of acts, or it may be effected by fraudulent schemes and contrivances, under the color of loans, discounts, checks, or entries. The methods of its accomplishment do not change the character of the act. If the ultimate result is to wrongfully obtain funds or moneys of the bank, without its knowledge or consent, and convert the same to the wrong-doer's use and benefit, the instrumentalities resorted to or employed to effect that end in no way change the criminal character of the act.

The last of the charges relate to false entries. Counts forty-three, forty-five, forty-six, forty-seven, forty-eight, forty-nine, and fifty of the indictment, after the same general averment as to the organization of the bank under the laws of the United States, etc., as recited in the counts already noticed, charge the defendant with making or causing to be made various false entries on the books of the association, with intent either to deceive its officers, or to defraud the bank. This needs but little explanation. Any entry on the books of the bank which is intentionally made to represent what is not true, or does not exist, with intent either to deceive its officers, or defraud the association, is a false entry within the meaning of the statute making it a criminal offense. It may be done personally or by direction. If the false entry is calculated to deceive or defraud, the making or causing it to be made on the books, with intent to deceive or defraud, is all that is necessary to bring the act within the meaning of the statute, and make it a criminal offense. The circumstance that the attempt to deceive by making the false entry was not done in an adroit or skillful manner, does not relieve the act of its criminal character; nor will the fact that the falsity of the entry could be easily exposed or detected

by inquiry, or the examination of other books of account, render such an entry any the less false and criminal, if made to deceive or defraud. In order, therefore, to convict the defendant of making false entries in the books of the bank, it is not necessary to show that the entries were made by his own hand, or in his presence. If the proof establishes to your satisaction that the entries were in fact false in the particulars charged, and that they were made by some clerk or book-keeper, under or in pursuance of the directions of the accused, for the purpose of fraud or deceit, that will be sufficient to make the act his, and to constitute the offense described in the statute. In describing the crimes of embezzlement, of abstraction, and of willful misapplication of the funds of the bank, and of issuing and putting in circulation certificates of deposit, without authority of the board of directors, I have said that the acts constituting these several offenses must be done or committed with "intent to injure or defraud,"—that they must be done with the intent to injure or defraud the association or some other company or person. This intent "to injure or defraud" is made by the statute an ingredient or element in each of said offenses. As the counts of the indictment relating to embezzlement, willful misappropriation, abstraction, and the issuing and putting in circulation certificates of deposit without authority, charge only an intent to "injure or defraud" the Fidelity National Bank, it will not be necessary to consider the meaning of these terms further than as applied to that association. The counts relating to "false entries" charge intent to defraud the bank, or deceive its officers. What is required in order to establish this intent to "injure or defraud" the association? In directing that these offenses or the acts which constitute them must be committed with intent to injure or defraud the bank, the statute does not mean that it must be made to appear that the party accused had malice or ill-will towards the association. These terms, as used in the statute, mean nothing more than that general intent to injure or defraud which always arises, in contemplation of law, when one willfully or intentionally does that which is illegal or fraudulent, and which, in its necessary and natural consequence, must injure another. So that, while these offenses of embezzling, of abstracting, and of willfully misapplying the moneys, funds, or credits of the bank, and issuing and putting in circulation certificates of deposit, without authority, must be committed by the accused with intent to injure or defraud the association, *that intent* may be shown, or may be conclusively presumed, from the doing of the wrongful, fraudulent, and illegal acts, which in their necessary results naturally produce loss or injury to the association. The law presumes that every man intends the legitimate consequences of his acts. Wrongful acts knowingly or intentionally committed can neither be justified nor excused on the ground of innocent intent. The color of the act determines the complexion of the intent. The intent to injure or defraud is presumed when the unlawful act which results in loss or injury is proved to have been knowingly committed. This is the well-settled rule which the law applies in both civil and criminal cases involving the question of intent. Human affairs could hardly be conducted, nor civil order be preserved, under

any other. If, therefore, the funds, moneys, or credits of the Fidelity National Bank are shown to have been either embezzled, or abstracted, or willfully misapplied, or its certificates of deposit wrongfully put in circulation, as already explained, by the accused, and converted to his own use, whereby, as a necessary, natural, or legitimate consequence, the association's capital is reduced or placed beyond the control of its directors, or its ability to meet its engagements or obligations or to continue its business is lessened or destroyed, the intent to injure or defraud the bank may be conclusively presumed. Acts involving such consequences, when knowingly and wrongfully committed, establish not only the guilty intent to injure or defraud mentioned in the statute, but they disclose moral turpitude utterly inconsistent with an innocent intent.

If, then, you are satisfied from the evidence, beyond a reasonable doubt, that the funds of this bank have been embezzled or willfully misapplied or abstracted by the defendant, and applied to his own use, benefit, or advantage, or to the use of persons other than the bank, resulting in loss or damage to the latter, his guilty intent to injure or defraud the association is sufficiently established. So, too, in reference to the charges of having made false entries, if it appears from the proof to your satisfaction that the accused made, or caused to be made, false entries in the books of the bank, the doing of such illegal or wrongful acts will establish his guilty intent. Any and every false entry upon the books used in the transaction of its current business, is calculated either to mislead its officers, or work injury to the bank; and it is reasonable to assume that the official who makes or causes such entries to be made intends what are the legitimate consequences of his wrongful act. I do not wish to be understood as meaning that the intent to injure or defraud is *conclusively established* by simple proof of the doing of the prohibited act which results in injury. What I mean is this: that when the prohibited act is knowingly and intentionally done, and its natural and legitimate consequence is to produce injury to the association, or benefit to the wrongdoer, the intent to injure or defraud is thereby sufficiently established to cast on the accused the burden of showing that his purpose was lawful and his act legitimate.

I have said, also, in defining these crimes, that you must be satisfied from the proof before you beyond a reasonable doubt that they were committed by the defendant as charged. That needs some explanation, perhaps. In civil suits mere preponderance of evidence will ordinarily turn the scales in favor of the party on whose side it exists; but in criminal cases, with the presumption of innocence which the law makes in favor of the prisoner on trial, something more is required than a mere balance or preponderance of proof against him in order to warrant a conviction. To justify the jury in returning a verdict of guilty, the evidence should be of such a character as to satisfy their judgment and consciences as to the guilt of the accused to the exclusion of any other reasonable conclusion. If, therefore, the jury can reconcile the evidence with any reasonable hypothesis consistent with the defendant's innocence, they should do so, and in that case find him not guilty. Or if, after

weighing all the proof, and looking only to the proof, you impartially and honestly entertain the belief that the defendant may be innocent of the offenses charged against him, he is entitled to the benefit of that doubt, and should be acquitted. It is not meant by this, gentlemen of the jury, that the proof should establish the prisoner's guilt to an absolute certainty, but merely that you should not convict unless, from all the evidence, you believe the defendant guilty beyond a reasonable doubt. While attempts to explain the term "reasonable doubt" do not usually result in making it any clearer to the minds of a jury, and while the court might content itself with saying simply that you must be satisfied, from the evidence, of the prisoner's guilt beyond a reasonable doubt, in order to convict him of all or any of the offenses charged against him, still, as it is the general practice of courts holding criminal trials to give some illustration or explanation of the character of the doubt which may be deemed reasonable, the court will say for your instruction and guidance that speculative notions or possibilities resting upon mere conjecture, not arising or deducible from the proof, should not be confounded with what is meant by a "reasonable doubt." A doubt suggested by the ingenuity of counsel, or by your own ingenuity, not legitimately warranted by the testimony, or one born of a merciful inclination or disposition to permit the defendant to escape the penalty of the law, or one prompted by sympathy for him or those connected with him, is not what is meant by a "reasonable doubt." On the contrary, a reasonable doubt, as that term is employed in the administration of criminal law, is an honest, substantial misgiving, generated by the insufficiency of the proof; an insufficiency which fails to convince your judgment and conscience, and satisfy your reason as to the guilt of the accused. If the whole evidence, when carefully examined, weighed, and compared, produces in your minds a settled conviction or belief of the defendant's guilt,—such a conviction as you would be willing to act upon in the more weighty and important matters relating to your own affairs,—you are free from any reasonable doubt, and should find a verdict in accordance with that conviction or belief. As already stated, it is not required either that the evidence shall establish, or that you should have an absolute certainty of, the prisoner's guilt, but merely that degree of certainty and belief with which you would decide upon and conclude your own most important transactions in life. Having that sort or degree of certainty or belief with which you would transact your own affairs of moment, or would feel safe in acting upon in matters of the highest concern in respect to your own personal interest, it could not be said that you had any reasonable doubt. If, however, the proof leave your minds in such a state of doubt or uncertainty as to the guilt of the accused as would deter you from acting in important matters which concern yourselves, such a state of mental uncertainty would constitute a reasonable doubt. You may, therefore, in testing the character of the conviction or belief as to the guilt of the prisoner, ask yourselves this question: Would such a degree of conviction, certainty, or opinion, as the proof in this case has made upon my mind, be sufficient to induce or lead a prudent man to act

in a matter of the highest concern and importance to his own personal interest? If you answer that question in the affirmative, then you cannot be said to have any reasonable doubt of the prisoner's guilt. On the other hand, if the proof leave your mind in such a state of doubt and uncertainty as to the guilt of the accused as would deter or prevent a prudent man from acting in matters of great moment and importance to himself, there would exist a reasonable doubt, and the defendant should have the benefit of that doubt.

A word or two in relation to the authority of the directors of a national bank. If the directors or managing committee of a national bank, in the honest exercise of official discretion, in good faith and without fraud, make loans or discounts for the actual or supposed advantage of the association, there is no criminal responsibility, although the transaction may be injudicious and unsafe, and actually result in loss or damage to the bank. But if such loans or discounts are made in bad faith, for the purpose of personal gain, or for private advantage of the officers, and not therefore in the honest exercise of official discretion, the officer making them crosses the dividing line between honesty and dishonesty, and his action is criminal and punishable under the statute, if done with intent to injure or defraud the association. The defendant in this case had authority, between the meetings of the board of directors, by virtue of his official position as vice-president and as a member of the managing committee of the bank, to make *bona fide* loans of the bank's funds, and to have the sums so loaned placed to the credit of the borrower. But this authority to make, direct, or sanction loans or discounts extended only to legitimate transactions, honestly intended for the benefit of the bank. Loans made on credits given in bad faith, for the purpose of defrauding the bank, or to enable him to convert the same to his own use and benefit, or for the use and benefit of another, would be an unlawful and criminal exercise of authority. The form of a loan or giving of credit upon the books of the bank may be adopted as a cover and pretense to conceal a fraudulent transaction; and when resorted to for that purpose, and the moneys of said association are withdrawn by such means, and converted to the officer's own use, whereby injury results to the bank, he is guilty of a criminal act. A false or fictitious credit given to himself or to others acting for his benefit, is no credit in the sense of the law. It neither confers rights in favor of the party to whom it is given, nor imposes obligations on the bank. The form which such a transaction may take, the methods adopted to reach the fraudulent ends, or the instrumentalities employed, whether consisting of one act or a succession of acts, to accomplish the fraudulent purpose, in no way changes or alters the character of the act. The law looks through forms, devices, and contrivances to results. No system of book-keeping, however adroitly or cunningly devised, can give validity to a fraud. If, therefore, fictitious or fraudulent credits were given upon the books of the bank, either to the defendant or to other persons acting for him, neither he nor they acquired thereby any right to the funds of the bank represented by such credits. A credit upon the books of the bank, to be valid and create the

relations of creditor and debtor between the parties having such credits and the bank, must represent value received by the bank in the shape of actual cash, or what is honestly deemed its equivalent. It must represent *bona fide* indebtedness of the bank. Such a credit obtained by an unauthorized charge or credit ticket, without consideration passing to the bank, is no credit in the eye of the law; and when the funds of the bank are drawn out under such a credit, they are wrongfully obtained.

Having defined and explained what is necessary to constitute the various offenses with which the defendant stands charged, and having given you a brief statement as to the authority of directors, indicating what they may or may not lawfully do, in dealing with the funds committed to their care, it is for you, gentlemen of the jury, now to apply the facts established by the proof to the law, and determine whether the defendant is guilty of all or of any of the offenses charged against him. A few general facts are undisputed, or are proved by the testimony on both sides, and may therefore be taken as admitted. It is conceded that the Fidelity National Banking Association was organized and established under the laws of the United States; that it was located within the jurisdiction of this court, in the city of Cincinnati, Ohio, where it conducted and carried on its banking business from March 1, 1886, until the evening of June 20, 1887, when it was declared insolvent by a bank examiner, and its doors closed, and its assets placed in the hands of a receiver; that during the period of its existence in business the defendant, E. L. Harper, was both a director and vice-president of the bank; that he not only acted as such, but had the chief control and management of the association; that the discount or managing committee of the bank consisted of the president, Mr. Swift, Benj. E. Hopkins, cashier, and the defendant; that the bank commenced business about March 1, 1886, with a paid-up capital of $1,000,000; and that on the twentieth of June, 1887, when its doors were closed, the association was insolvent, and there was a general deficiency of over $4,000,000, the bulk of which was lost in wheat speculation which was conducted by J. W. Hoyt and by Wilshire, Eckert & Co. For whose benefit and account said J. W. Hoyt and Wilshire, Eckert & Co. transacted that business, is for you to determine from the proof. The foregoing facts may be considered established as to all of the counts of the indictment. In referring to the testimony on all other points or questions of fact, which are controverted, the court is not to be understood as expressing any opinion as to which side or version of the conflicting testimony you are to credit or believe; that is your province. The court may not with propriety express in your hearing its opinion, either as to the guilt or innocence of the accused, or as to what is proved where the testimony conflicts. Where certain facts are conceded or established by the proof, both for the prosecution and the defense, the court may, without encroaching on the province of the jury, instruct you as to the legal conclusions which follow from such facts.

I now invite your attention to a brief review of some of the transactions, in their chronological order, which are charged against the defendant, and which are referred to in the testimony. The first in order is

the credit of $1,000,000, given on the twelfth of August, 1886, to the Riverside Iron & Steel Company. Mr. Gahr, the secretary and treasurer of that company, as well as the defendant, have stated to you in their testimony that that credit was given, not as a real loan, but for a special purpose; that the money on that credit was not to be drawn out; that it was given in order to increase the appearance of the deposits of the Fidelity National Bank, that it might present to the public a large deposit account. This credit is given and the Riverside Iron & Steel Company is charged with the amount on what is called "The Call Loan Account." Both witnesses say that the money represented by said credit was not to be drawn out; that the credit was simply on the books of the bank in order to increase the appearance of the deposits of the bank. On the twenty-first day of October, 1886, $40,000 of that fictitious account was returned to the bank, or canceled by a check of the company on that same credit. On the thirtieth day of October, 1886, the defendant testifies that he was engaged in purchasing stocks, and needed funds to pay for the same, and that he took from the Riverside Iron & Steel Company, or its treasurer and cashier, in order to enable him to complete his purchases on his stock transactions, a check from that company for $50,000 on that credit of $100,000, which he used for his private purposes. Now, gentlemen, if you believe the defendant, if you believe the testimony of Mr. Gahr, that was a wrongful abstraction of the funds of the bank. On the tenth of March, 1887, the interest on that apparent loan was paid by a check on the same credit, amounting to $1,757. On June 16, 1887, a check for $8,242 is given to balance the account. Now, that credit of $100,000 was false and fictitious, under the facts stated, and did not represent any indebtedness from the Fidelity National Bank to the Riverside Iron & Steel Company. The defendant knew that fact, and when, therefore, he took the check of $50,000 and withdrew from the bank that $50,000 which was not a *bona fide* indebtedness to the Riverside Iron & Steel Company, and which he knew was not, he wrongfully and willfully misapplied the funds of the bank. We pass on now, and for the present I shall omit all reference to the Wilshire transactions, and call your attention to them later on. What do we find next? On the twelfth of February, 1887, the defendant—as it is in proof, and as it is shown by his signature on the charge and credit ticket, and as admitted by himself on the stand, having previously arranged for a credit with the First National Bank of New York, which was not real, but fictitious, and for which no consideration was given—makes out a charge and credit ticket for $200,000, by which the First National Bank of New York is charged and himself credited with that amount on the books of the Fidelity National Bank. And the credit thus taken to himself is thereafter checked out by the defendant during the month of February, 1887, as shown by the books; and, as the evidence shows, for his private use and benefit. When he took to himself that credit by means of a mere charge and credit ticket,—if you believe the testimony,—as he states, and as the other witnesses state, he took to himself a false credit that did not entitle him to withdraw the money from the bank. A credit so taken did not create

an indebtedness on the part of the bank for the amount thus represented. He is chargeable with the full knowledge of that fact. If you believe these to be the facts, and if he did thus take to himself a credit on the books of the bank for $200,000, and on such credit drew out the funds of the association for his own use, then he was guilty of willfully and wrongfully abstracting the moneys of the bank. On the twenty-eighth of February, 1887, that transaction is repeated; without a dollar being deposited in the bank, and without any consideration given by himself, he has a second charge ticket made out, in his own handwriting and signed by himself, and under his direction another $200,000 is charged to the First National Bank of New York, and credited to himself; and he draws out of the bank this amount, as his account shows. Gentlemen, if you find that this second credit of $200,000 was taken or obtained in that way, the amount of that credit did not represent any indebtedness of the bank to the defendant; and when he drew the money from the bank, represented by that credit, he wrongfully withdrew it. No liability of the bank by a mere charge and credit ticket in his own favor, without consideration, could be thus created. The defendant could not in that way acquire any right to the funds of the bank. Again, on April 28, 1887, the defendant caused two certificates of deposit for $200,000 each to be issued to the First National Bank of New York. These were dated the twenty-eighth of April, 1887. No money was deposited in the bank to cover these transactions; and the defendant states in his examination before you that he gave his individual checks for the amounts of these two certificates of deposit. On the books of the bank, which are in evidence before you, no such charge is made to his account, and no such checks appear to have been given by him.

Now, look at that transaction a little further. On or about the time that these certificates were forwarded to New York, it is in proof before you that he drew or that there were drawn in favor of Wilshire, Eckert & Co., two drafts of the Fidelity National Bank for $100,000 each,—Nos. 2701 and 2703,—against that fund standing to its credit with the First National Bank of New York. These two drafts bear date of April 28 and April 30, 1887; are made payable to the order of J. W. Wilshire; and they are indorsed by him. One goes to Rosenfeld & Co. of Chicago, and the other goes to C. J. Kershaw & Co. of Chicago. They are in evidence before you with all their indorsements. Wilshire, Eckert & Co. give for these two drafts their own checks on the Fidelity National Bank of the same date, for $100,000. Now, these two checks are not entered on the books of the bank at the time, and do not appear until the eighteenth of June, 1887, when the bank was almost failing. If you should hereafter find, when the court comes to refer to that transaction, that these two drafts drawn on the First National Bank of New York in favor of J. W. Wilshire, and which by his indorsements passed to Rosenfeld & Co. and C. J. Kershaw & Co., were for the use and benefit of the wheat transaction in which the defendant was interested, you will see in a moment (and the court may state the legal consequences) the result of that transaction would be such that the defendant would get to

his use $400,000 of the funds in the bank here, in the two credits of February 12th and February 28th; and $200,000 more by means of the two drafts on the First National Bank of New York. No book-keeping —no matter how mysterious, no matter by what method, whether single or double entry—can cover a transaction of that sort. Men cannot acquire rights by a mere slip of paper directing credits to be given to themselves; $200,000, $400,000, and $600,000 cannot be realized by making a charge and credit ticket. The man who does this, does a willful wrong and a criminal act. When, upon the strength of credits thus obtained, he draws money from the national bank of which he is an officer, he is guilty of the criminal offense described in the statute.

, We come now to another transaction, on the twenty-eighth of February, 1887, when a certificate of deposit for $300,000 is issued or made out by the Fidelity National Bank, and forwarded to the Chemical National Bank of New York. The defendant states that he gave his own check for that certificate. The books of the bank containing defendant's individual account, exhibited before you, show no such charge against him, and the expert witness testifies that there is no such check charged to his account, so that the bank never got the equivalents for the certificate of $300,000 thus forwarded to the Chemical National Bank of New York, and placed to the credit of the Fidelity National Bank. But on the same day that this certificate is forwarded, as admitted by the defendant, he makes out a charge and credit ticket by which that $300,000 is charged to the Chemical National Bank and credited to himself on the books of the Fidelity National Bank. That, in the light of the testimony before you, if you believe it, was a false, fraudulent, and fictitious credit; and when the accused subsequently drew from the bank the amount so represented by the credits taken to himself, and used it in these wheat transactions, whether through J. W. Hoyt, or Wilshire, Eckert & Co., he wrongfully misapplied funds of the bank which he was not entitled to; and he thereby committed a fraud upon the bank, and a criminal act in the eye of the law. What more was done in that transaction? This $300,000 certificate of deposit goes to the Chemical National bank, and is there placed to the credit of the Fidelity National Bank, and on March 9th a draft is made in favor of J. W. Hoyt, by Benjamin E. Hopkins, assistant cashier, and which the defendant approved, and which goes ultimately into his account for the sum of $75,-000 on the Chemical National Bank of New York. This draft is indorsed by said Hoyt and turned over to Kershaw & Co., and which Kershaw & Co. collected through the American Exchange National Bank of Chicago, and used the amount in wheat transactions, in which said Hopkins and the defendant were jointly interested. On the fourteenth of March that transaction is repeated and a draft for $15,000 given to Hoyt on that same fund which Hoyt indorsed to Kershaw & Co., and which Kershaw & Co. not only collected, but used like they did the draft for $75,000 for the benefit of Benjamin E. Hopkins, in the purchase of wheat on margins; and in these transactions for account of Hopkins, the defendant tells you he was personally interested. Now, what is the re-

sult of that transaction? $300,000 of the moneys of the bank is by a false credit wrongfully placed at the disposal of the defendant here. The amount represented by that false credit is withdrawn and used for his personal benefit in those wheat transactions. And, while the amount of the certificate of deposit is standing to the credit of the Fidelity National Bank, in the Chemical Bank there is drawn against it in favor of Hoyt, two drafts amounting to $90,000, under date of March 9th and March 14th, which are indorsed over to and used by Kershaw & Co. in the purchase of wheat for the account of the parties represented by Hoyt. What is the result? $300,000 is appropriated by the defendant here by means of the false credit taken to himself, and $90,000 more is taken out of the bank's assets by means of these drafts in favor of Hoyt, and for the joint account of the defendant and Hopkins. While the bank's assets and credits are thus being misapplied here, that certificate of deposit for $300,000 is still held by the Chemical National Bank as a subsisting liability and outstanding obligation of the Fidelity National Bank. Now, I say to you, as I said before, that the law looks through all forms and instrumentalities or methods of book-keeping by which such transactions could be accomplished. It is unlawful, it is fraudulent, it is criminal in the highest sense of the law within the meaning of the statute. Now, it is not necessary or material to trace or follow each specific draft or letter of credit used in these extensive transactions; for, having determined their character by established facts, you may read the details in the light which they reflect upon the whole transaction.

Let us come now to the credit of $285,000 that was placed on the books of the Fidelity National Bank, and, as one of the book-keepers testified, by the authority of Mr. Harper, which he denies, and you must therefore determine that fact. On the twenty-eighth of May, 1887, there is placed or is given a credit to Irwin, Green & Co. of $285,000, and at various dates that account is debited; first, $3,668.75, which one of the counts charges to be a false entry; it is next debited with $5,750, which one of the counts charges to be a false entry; it is next debited with $40,537.50, which one of the counts charges to be a false entry; it is next debited with $1,443.75, which one of the counts charges to be a false entry; and next debited $123,206.25, aggregating $174,606.25, all of which are charged in the indictment to be false entries, or false debits. Now, on the thirteenth of June, 1887, Irwin, Green & Co. checked against that credit; but it is not pretended in the evidence that they ever deposited a dollar, or gave any consideration whatever for that credit. But on the thirteenth of June they checked against that credit for the sum of $70,000. Taking that $70,000 with the debits previously charged, make up the sum of $244,606.25, leaving a nominal balance of $40,393.75; now, how was that $70,000 paid, and how was that balance of $40,393.75 arranged? These two sums, aggregating $110,393.75, how were they arranged? For the defendant has stated in his evidence before you that he knew of this transaction, but did not know of this $285,000 credited to Irwin, Green & Co. at the time it was given, but he knew Hopkins was using this credit in the purchase of wheat through

Irwin, Green & Co., as well as other brokers in Chicago, and admits that he was interested with Hopkins in the wheat transactions. Now, how was this balance arranged? It was arranged by two checks given by Mr. Hopkins, and put in the teller's drawer as cash, as stated by one of the witnesses, amounting to $110,393.75. Then what was done? It was stated in the evidence by the witnesses that Mr. Harper came and took out these two checks of Mr. Hopkins that were intended to square that account, and substituted two checks of Wilshire, Eckert & Co., one of them for $100,000, and one for $11,500, which was dated October 12, 1886, being the $11,500 check which the defendant stated to you had been given to him about some old bond transaction in the fall of 1886; so that the $70,000 draft of Irwin, Green & Co., on the Fidelity National Bank, and the balance of $40,393.75 to their credit, was first covered by the checks of Hopkins, which were held for a while as cash, and then the defendant took the checks of Hopkins out and substituted as so much cash these two checks of Wilshire, Eckert & Co.,—one bearing date of May 30, 1887, and the other bearing date of October 12, 1886; the one of May 30th for $100,000, and the one of October 12th for $11,500. These two checks are of Wilshire, Eckert & Co., aggregating $111,500, and exceeded the Hopkins checks by the sum of $1,106.25, and for this excess the defendant took credit to himself in his individual account. Now, gentlemen, it was known to the defendant, as he admits, before that money—the $70,000—was paid, that that was a fictitious credit which had been given to Irwin, Green & Co.; he had learned that, he states, before. It is shown that that $70,000 went out of the bank in cash, and without consideration. The others were entries. That $70,-000 went out of the bank, and went out by the knowledge and with his consent, if you believe the evidence. The defendant, in this statement, before, on the examination of his counsel, says that he was interested with Hopkins in the transactions that were carried on by and through the broker J. W. Hoyt, who employed Irwin, Green & Co. to make the purchases of wheat in Chicago. That his interest—which led him into it—was his anxiety to save the bank, in which he has stated he had a large controlling interest, and then, after saving the bank and refunding what it had advanced, to divide the profits with Mr. Hopkins. Now, look for a moment what went out of the bank on that wheat transaction carried on in the name of Hopkins. There went to Irwin, Green & Co., through J. W. Hoyt, on that deal, as it may be called, for the account of Hopkins and for the defendant, out of the funds of the Fidelity National bank, the sum of $555,381.25, for which the checks and drafts were here exhibited and identified before you. There went through Hoyt to the firm of C. J. Kershaw & Co. on this same account, and for this same purpose, and out of the bank's money, the sum of $273,000, for which the drafts and checks were presented in evidence. There went through the same source, J. W. Hoyt, to Orr & Comes, $50,000 on that deal out of the funds of the bank; and there went to Irwin, Green & Co., $70,000 on that false credit of $285,000. These amounts are connected with the deal or speculation in wheat in which the defendant admits him-

self to have been interested with Hopkins. Then, recurring for a moment to the three charge and credit tickets, dated February 12th, February 28th, and March 2d, aggregating $700,000, the whole of which the defendant took to himself as a credit, by the mere writing on a slip of paper, "Credit me," and which he used as his account shows. He took to himself that $700,000. If these amounts had been charged to him, as the proof of the clerk who kept the individual account explained to you, his account on the twentieth of June would have been overdrawn between $700,000 and $800,000. Supposing these two amounts had been charged to him, to say nothing of the drafts which he drew in favor of Wilshire and Hoyt, which would have added to that amount and made his account overdrawn in the neighborhood of $900,000. Now, in addition to the amounts advanced, as I have stated, on what is called the Hoyt and Hopkins wheat deal, directly in cash, there are outstanding liabilities against the bank made by means of letters of credit; there appears from the evidence to be due to Kershaw & Co. and Irwin, Green & Co. on letters of credit that are still outstanding, large balances, which they claim; Irwin, Green & Co. still claim on that $285,000 credit a balance of $215,000; Kershaw & Co. still claim $781.25.

We come now, later on, to another transaction, when the bank was in distress,—when by reason of circulars, or otherwise, suspicion was aroused that the bank was going under, and the run commenced upon the bank. On the fourteenth of June, on the evening of that day, after the close of banking hours, the vice-president, the assistant cashier, and Mr. Wilshire are together at the bank, having previously telegraphed the American Exchange National Bank of Chicago, as stated by all the parties, and as proved by the government, that they concluded to telegraph to the American Exchange National Bank, to know if $600,000 would keep the deal afloat. They got an answer that gave them ground for encouragement, and on the evening of the fourteenth of June, $1,000,000 of bills receivable of the bank were taken and sent by the action of these parties to the Chemical National Bank of New York. Now, contemporaneously with the sending of this $1,000,000 to New York, $600,000 in drafts and letters of credit of the Fidelity National Bank—$400,000 in drafts, and $200,000 in letters of credit—are drawn out and placed in the hands of Wilshire and Gahr by the defendant, to be carried to the American Exchange National Bank of Chicago, to sustain this wheat transaction. The defendant tells you in his testimony, that when that run commenced, and when he was calling for help in all directions, and trying in every way to save the institution, this $1,000,000 of the bills receivable of the Fidelity National Bank were sent to New York to the Chemical National Bank, as collateral in order to lay the foundation and provide a credit to sustain the bank. But in the very act of sending these collaterals as a basis of credit for the bank, he was drawing on the Chemical Bank to the amount of $600,000 for illegitimate and criminal purposes. These four drafts for $100,000 each, and the letters of credit for $200,000, issued on the evening of June 14, 1887, are still held as subsisting or outstanding obligations and liabilities of the bank, which never received any consideration therefor.

Gentlemen of the jury, the defendant has explained to you, and which, by the way, is not competent nor relevant to this transaction, that at this time he was making desperate and heroic efforts to save the bank. This is not relevant in this case. The man who scuttles a ship may, as she is in the act of sinking, exert desperate and even heroic efforts to save it from the peril which his own wrongful act has produced; but such efforts do not change the character of the wrongful act which put the vessel in danger. If I were to wrongfully fire upon you and produce a dangerous wound, I may, with all my skill and energy, try to stanch the flow of blood, but it does not change the criminal act which produced the wound. If he had intended to refund all those moneys, and had had the means to do it, and had come in on the morning of the twentieth of June and said, "I have taken out $2,800,000 from the funds of this bank, and here is the money in gold coin to replace that sum," it would not change the criminal character of the previous act. So, gentlemen, do not be misled by anything of this sort. Subsequent efforts to remedy or avoid the consequences of criminal acts can never condone the commission of the wrongful and forbidden offenses. It is not necessary that the funds of the bank should have been drawn or paid out for the defendant's exclusive benefit; if, as he admits, he was interested in the wheat transactions conducted through J. W. Hoyt in the name of Benjamin E. Hopkins, and he knew that the funds of the bank were being used in these purchases, he is equally as responsible, civilly and criminally, as though they were used exclusively for his own account.

Now we come to the wheat transactions which were conducted by Wilshire, Eckert & Co., and J. W. Wilshire & Co. There was taken out of the Fidelity National Bank, as the evidence discloses, in cash, on the individual or personal checks of these parties, that were never presented or intended to be presented to the banks on which they were drawn, but were held by the direction of the defendant as cash, over a million dollars, and in addition to that amount, in actual cash, they took out in letters of credit $350,000. Now, how and why was this done and permitted? The explanation of the defendant in regard to these transactions, is this: He states that in the spring or summer or early part of September, 1886, J. W. Wilshire, by means of wheat transactions, had lost, and owed the bank, about $200,000; that in October, 1886, said Wilshire, in the absence of the defendant, got an additional loan through one of the cashiers of $26,500; and that along in February, or early in February, 1887, in his absence, said Wilshire got a draft certified by the cashier, and obtained the money on it, for $60,000 or more. The defendant tells you on the stand that his eyes began to open in the fall of 1886, when Wilshire wanted more money for wheat speculation; when he talked roughly to him, and told him that he had got these two checks of $26,500 and of $60,000 in his absence, and without his knowledge, from the cashier. What then? Having that much money at stake, the defendant tells you that he concluded that he would stake Wilshire further, and see him through the wheat deal, which he says was Wilshire's wheat deal, and not his own. Time goes on, and by the means of Wilshire's checks or the checks of Wilshire, Eckert & Co., there is

withdrawn from the bank, with the knowledge and consent of the defendant, $1,446,000 in cash and letters of credit, as shown by the books of the bank, to help Wilshire in his dangerous and hazardous wheat speculation, in order to save the $86,500 which Wilshire got improperly before. Now, gentlemen, if you believe the testimony of the defendant, he knowingly permitted Wilshire to withdraw and misapply the funds of the bank, and in so doing violated the law by doing just what the law intended he should not do. Suppose a gambler had come and said to him: "Mr. Vice-President, I have lost $40,000, $60,000, or $80,000 in betting at a faro bank; and I have obtained that money from your bank; and if you do not give me more money, to carry me through, in order to win back the money I have already borrowed and lost, you will be in danger of losing the $80,000;" and the bank officer thereupon furnishes him the money of the bank day after day, month after month, to be used in gambling. I need hardly say that this would not be a legitimate transaction. The officer of the bank so dealing with its funds would be as guilty—criminally guilty—as if he had himself withdrawn the money, and squandered it at the gaming table. The funds of a national bank cannot be legitimately put, by an officer thereof, at hazard upon the chances of a rise or fall in the market price of any fluctuating commodity. So, gentlemen, the court instructs you that on the statements made by the defendant on the stand, assuming that Wilshire, Eckert & Co., or J. W. Wilshire & Co. were the real principals in the wheat transactions which they conducted,—on his own testimony, here in the presence of the court and jury,—he admits that he committed an act which the statute was passed to prevent. Bank officers cannot deal with money intrusted to their care in that way. It is an illegitimate, unlawful, and dishonest exercise of authority, so to employ the funds of the bank; and when it is knowingly done, the officer permitting it is responsible. But were those transactions conducted for the benefit of J. W. Wilshire, or Wilshire, Eckert & Co.? They swear before you that they were acting for the defendant. Hoyt testifies that he understood that he and Wilshire, Eckert & Co. were representing the same principals, and on the strength of that funds standing to the credit of Hoyt on the books of C. J. Kershaw & Co. of Chicago, are transferred to the credit of Wilshire, Eckert & Co. to the extent of $600,000 or $700,000. The prosecution introduced orders and directions in the handwriting of the defendant, for the purchase of wheat, which the defendant says were mere *memoranda* of advice; but it is for you, gentlemen, to determine how that is; you must look at his position as defendant, and at his interest in the statement. Then look at the other testimony, and see whether the truth lies with the statement of Wilshire, Eckert & Co., corroborated as it is by the written orders and directions of the defendant, and other testimony in this case; if the truth lies with Wilshire and with Eckert, and with the papers here presented, then the defendant, in addition to the amounts drawn out by Hoyt, has criminally, for his own use, drawn through Wilshire, Eckert & Co. $1,466,000 of the bank's assets, and applied them as Wilshire swears to the purchase of wheat on margins for defendant's

account, which margins were lost, thereby wrecking an institution which ought to have served and could have served a useful public purpose and function.

The verdict must respond to each count in the indictment, for the reason that each contains a distinct and substantial charge against the defendant. If you find he is not guilty on all of the charges in the indictment, you will return a general verdict of not guilty. If your verdict is guilty on all the counts, you will say by your foreman, "We find the defendant guilty as charged in the indictment." If you find him guilty on some counts and not guilty on others, you will specify accordingly.

I congratulate you, gentlemen, on the termination of a long and tedious case. I leave it in your hands, feeling assured that from the close attention you have given the evidence as it was introduced, you will return an honest, upright, and just verdict, and a true deliverance make between the government and the accused.

The jury returned a verdict of guilty as charged in 32 counts of the indictment.