GARDES v. UNITED STATES.[1]

GIRAULT v. SAME.

(Circuit Court of Appeals, Fifth Circuit. April 19, 1898.)

No. 646.

1 CRIMINAL PROCEDURE—INDICTMENT—SEVERAL COUNTS.
Where an indictment consists of numerous counts, the trial court may, in the exercise of sound judicial discretion, require the government to elect certain counts upon which it will ask conviction; but where the counts are all for transactions connected together, or of the same class, their joinder is proper, under Rev. St. § 1024, and the exercise of the court's discretion will not be disturbed, except in a clear case of improvidence or abuse.

2. SAME—MISTRIAL—FORMER JEOPARDY.
Where, during the trial, a juror becomes disqualified, and the court adjudges a mistrial, a plea of former jeopardy is not good on a second trial, even though all parties were willing to proceed with 11 jurors.

3. SAME—READING OF INDICTMENT.
Where defendants have been arraigned, and have waived reading of the indictment, they may not subsequently complain if the whole indictment is not read at the trial, but such parts of it are read, and such explanations made of the other parts, as may give the jury the clearest comprehension of it.

4. SAME—VERDICT—FORM.
Where the jury find accused guilty upon all counts of an indictment, "Guilty as charged," without specifying the counts, is a proper form of verdict.

5. SAME—COUNT TO SUSTAIN.
Where the verdict is sustained by one good count in the indictment, it must stand, even if all the other counts are bad.

6. SAME—INDICTMENT—AMENDMENT.
Where, after mistrial, and before a new trial, amendments are made to purely formal parts of certain counts of an indictment, and the defendants are not rearraigned, even if the irregularity is material it can affect only the counts so amended, and the error is cured by arrest of judgment on such counts.

7. SAME—SENTENCE—HARD LABOR.
Where the statute under which a prisoner is sentenced provides for imprisonment, but not at hard labor, the words "at hard labor" should not be inserted in the sentence, even if hard labor is a part of the discipline of the prison at which the sentence is to be served.

In Error to the Circuit Court of the United States for the Eastern District of Louisiana.

J. R. Beckwith, for plaintiff in error Gardes.

Girault Farrar and A. D. Henriques, for plaintiff in error Girault.

J. Ward Gurley, for the United States.

[1] Rehearing denied May 24, 1898.

Before PARDEE and McCORMICK, Circuit Judges, and SWAYNE, District Judge.

McCORMICK, Circuit Judge. Henry Gardes was president, and Walter W. Girault was cashier, of the American National Bank of New Orleans, La. They and Thomas H. Underwood composed the firm of T. H. Underwood & Co., which firm was a customer of the bank. Gardes, Girault, and Underwood were indicted together, under section 5209 of the Revised Statutes. The first two were charged with embezzling, abstracting, and willfully misapplying the moneys, funds, and credits of the bank; and Thomas H. Underwood was charged with aiding and abetting them; and Walter W. Girault was charged with making false entries in the books of the bank; and Henry Gardes and Thomas H. Underwood, with aiding and abetting him in making the false entries. The indictment contained 136 counts. It charged 40 different offenses,—32 distinct acts of embezzlement, abstraction, and willful misapplication, and 8 separate false entries. Each one of the 32 distinct acts of embezzlement, abstraction, and willful misapplication is charged three times; that is, embezzlement, and aiding and abetting in the embezzlement, of a particular amount, upon a particular date, are charged in one count; the abstraction, and aiding and abetting in the abstraction, of the same amount, are charged in another count; and the willful misapplication of, and aiding and abetting therein, are charged in another count; so that the 32 distinct and separate acts, each being made the basis of 3 counts, are the subject of 96 counts in the indictment. Each of the 8 separate false entries is charged 5 times; that is, five counts for each entry,—a count for each of the intents and purposes stated in section 5209. Before the case was submitted to the jury the district attorney dismissed counts 79, 80, 81, 88, 89, 90, 91, 92, 93; and, after the verdict, judgment was arrested on counts 4, 7, 10, 13, 16, 19, 22, 25, 28, 31, 34, 37, 40, 43, 46, 49, 52, 55, 58, 61, 64, 67, 70, 73, 76, 79, 82, 85, 88, 91, 94. Gardes and Girault filed demurrers to the indictment on the ground that there are several distinct offenses charged against each defendant in the several counts, not for the same act and transaction, but for different acts and transactions, and crimes not of the same class of crimes or offenses. Gardes, in his demurrer, presented a further ground,—that he was charged in separate counts in different capacities; that is, in some he is charged as principal, and in other counts as aider and abettor. These demurrers were overruled, and the case went to trial March 29, 1897. The trial continued until April 14, 1897, when one of the jurors, I. W. Homan, became too ill to sit on the trial, and the case was continued until the next day. On the next day two physicians certified that the juror was permanently incapacitated, and thereupon a mistrial was entered. The case was again assigned for trial on the 17th day of May, 1897. On that day each of the defendants filed a plea of former jeopardy. Demurrers were filed to these pleas, and the demurrers were sustained, and the pleas dismissed, and a trial was again commenced May 18, 1897. It continued until June 12, 1897. Thomas H. Underwood was acquitted. Henry Gardes and Walter W. Girault were found guilty as charged. They bring this writ of error.

The errors assigned are numerous, but, in substance, they suggest that the circuit court erred (1) in refusing the motion made by the defendants to require the government to elect the counts in the indictment on which the district attorney will ask for conviction; (2) in sustaining the demurrers to the defendants' pleas of former jeopardy; (3) in dispensing with the reading in full of the indictment, and permitting, instead thereof, the reading only of certain counts, and a statement by the district attorney as to each of the other counts; (4) in admitting certain testimony offered by the government to prove the intent and purpose of the parties, and in explanation of certain entries made in the books of the bank by one of the witnesses; (5) in receiving from the jury a general verdict to the effect that they found Gardes and Girault "guilty as charged"; (6) in refusing to give certain charges requested by the defendant Girault.

The section of the statute under which these indictments are presented, so far as it bears upon them, and it is necessary to here quote, is in these words:

"Sec. 5209. Every president, director, cashier, teller, clerk, or agent of any association, who embezzles, abstracts, or willfully misapplies any of the monies, funds, or credits of the association; * * * or who makes any false entry in any book, report, or statement of the association; with intent, in either case, to injure or defraud the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of such association; and every person who with like intent aids or abets any officer, clerk, or agent in any violation of this section, shall be deemed guilty of a misdemeanor."

Section 1024 of the Revised Statutes provides:

"When there are several charges against any person for the same act or transaction, or for two or more acts or transactions connected together, or for two or more acts or transactions of the same class of crimes or offenses which may be properly joined, instead of having several indictments the whole may be joined in one indictment in separate counts. And if two or more indictments are found in such cases the court may order them to be consolidated."

It cannot reasonably be questioned that the transactions made the basis of the indictments in this case are connected together, and are of the same class of crimes and offenses. And, if the congress of the United States had the power to provide by statute as section 1024 was evidently intended to provide, it would seem that the language of the statute is a sufficient answer to any criticism of these indictments on the ground of misjoinder of the counts, or the excessive number thereof. Of the 32 offenses charged to have been committed, each is made the subject of three counts, manifestly because the language of the section applicable to the transaction denounced uses the three terms "embezzle, abstract or willfully misapplies." If it is suggested that 32 different transactions, each alike obnoxious under this penal statute, should not be accumulated upon the head of the offender at one time, it can be answered that the lawmaking power has taken a different view on that subject. It can, however, also be answered, both on reason and on authority, that it would manifestly be far more oppressive to the offender to torture him with 32 consecutive trials on 32 separate indictments than to combine them as the statute permits, and

subject him to only one trial. U. S. v. Simmons, 96 U. S. 360; U. S. v. Britton, 107 U. S. 655, 2 Sup. Ct. 512; U. S. v. Northway, 120 U. S. 330, 7 Sup. Ct. 580; Claassen v. U. S., 142 U. S. 140, 12 Sup. Ct. 169; Coffin v. U. S., 156 U. S. 432, 15 Sup. Ct. 394; Id., 162 U. S. 664, 16 Sup. Ct. 943; U. S. v. Harper, 33 Fed. 471. In the case of Coffin v. U. S., supra, the indictment contained 50 counts. Mr. Justice White, in opening his admirable summary and analysis of these counts, remarks that:

"The indictment is prolix and redundant, and it is difficult to analyze it so as to make a concise statement of its contents. It contains fifty counts, and alleges that the various offenses enumerated in them were committed on the different dates between January 1, 1891, and July 26, 1893. The counts embrace a number of acts made misdemeanors by the statute, and the charges are commingled in a very indefinite and confusing manner. All the counts, however, may be classed as follows."

He then proceeds with his classification and comments; but neither in his statement thereof, nor in the opinion of the court delivered by him, is it announced that the manner of counting in that indictment is not authorized by the statute, or that the government should have elected certain counts on which it would ask conviction, and enter a discontinuance as to the other counts. The case was reversed on the ground that the trial court erred in refusing certain requested charges, and in giving certain portions of its general charge to which the defendant reserved exceptions. The verdict in that case was a general verdict of "guilty as charged on all counts of the indictment." At the time the indictment was submitted to the jury to which their verdict related, it contained (as it did at the time the verdict was returned) 50 counts, as above stated. Afterwards, and before the writ of error was taken to the supreme court, the judgment was arrested on 20 of these counts. And on the second trial of the case only 17 out of the 50 counts originally contained in the indictment were submitted to the jury, and a verdict was returned finding one of the defendants guilty on 7 of the counts of the indictment; and against him judgment and sentence were pronounced, and he took his writ of error from that judgment to the supreme court. In disposing of this writ of error, Mr. Justice White delivered the opinion of the court. And while, in his statement of the case, he alludes to the fact that only 17 counts were submitted to the jury on the second trial, there is no word nor intimation that the manner and form of the counting, or the number or counts, in the original indictment, were not authorized by the statute. In U. S. v. Harper, supra, the indictment contained 57 counts, charging violations of section 5209. Judges Jackson and Sage presided at the trial. Judge Jackson (afterwards Mr. Justice Jackson) delivered the charge to the jury, and, in his direction as to the form of the verdict, said: "If your verdict is, 'Guilty on all counts,' you will say, by your foreman, 'We find the defendant guilty as charged in the indictment.'" It is manifest to us, from the language of section 1024, that the trial court has discretion to require the government, either before it has offered proof, or after it has closed its proof, to elect certain counts on which it will ask conviction, in all cases where the counts are

of such character, and so numerous, that in the judgment of the court the submitting of proof on each, and the submitting of issues to the jury on each, would or might lead to confusion, or unduly embarrass the accused in making his defense. And this discretion is doubtless a judicial discretion, and the subject of review in proper cases. The trial judge gets nearer to the case than judges of the appellate court can get. He is especially in a better position to judge of the sound exercise of this discretion than the appellate court can ordinarily reach. Therefore his exercise of this discretion should not be disturbed in cases where it is not clear that it was improvidently exercised. And while in this case it would have been as well, and might have been better, to have exercised a discretion in favor of the defendants' motion and have required the government to elect the limited number of counts on which the district attorney would ask the jury for a conviction, and withdraw the other counts from the consideration of the jury, either before the proof was entered upon, or after the government had closed its proof, we do not feel authorized by anything appearing in the record to hold that the judge's exercise of this discretion in this case was so far erroneous as to require the reversing of the judgment on that ground.

Was there error in sustaining the demurrer to the defendants' pleas of former jeopardy? The learning and genius of the counsel of plaintiffs in error addressed itself to this question with great force. In one of the bills of exceptions allowed by the trial judge, bearing upon this question, he makes this statement, as a part of the bill:

"With regard to the plea of former jeopardy, I state that the discharge of the jury on the first trial, on April 15, 1897, was a matter of imperative necessity, clearly and manifestly appearing at the time, and confirmed by the death of the juror Homan on Friday, April 17, 1897. I endeavored in every way to have the first trial go on. Notwithstanding the certificate of Drs. Holt and Martin, of date April 14, 1897, and hereto annexed, and made part of this bill of exceptions, I did not discharge the jury on that day, in the hope that the juror Homan might recover. On that day he was carried to his home, but instructed by me, through the marshal, that he was not discharged, and must hold no communication with any one concerning the case. The other eleven jurors were held confined. On the following day, April 15, 1897, Drs. Holt and Martin made the statement contained in their certificate of that date, which is hereto annexed, and made part of this bill of exceptions. Both certificates I read in open court prior to the discharge of the jury, in the presence of the defendants and their counsel, and stated that it was evident the trial could not go on. At no time did the defendants, or any of them, or any of their counsel, ask to interrogate the doctors, or either of them, or ask that they appear and make their statements orally in court. The statement made in defendants' pleas, that I took a recess on April 14, 1897, to enable the defendants to consider the proposition of the United States to proceed with the trial with eleven persons, is unwarranted. I ordered a recess without assigning any reason therefor; the main reason being to satisfy myself whether, even by consent, the trial could proceed with only eleven jurors. On the reconvening of the court on April 14, 1897, after recess, the defendants were silent as to any acceptance of the proposition of the United States attorney; and it was not until the next day, April 15, 1897, after I had stated that I had examined the question fully, and was satisfied that the trial could not legally be had with eleven jurors even by consent of parties, that the defendants stated that they had agreed to the offer of the United States attorney to proceed with eleven jurors, and that they would waive all irregularities, etc. It was clear to me, after a full review of the cases, that, under

any view of the matter, there could be no departure from the regular course of criminal procedure without consent of the court, which I did not give. I certify that neither of the defendants objected to the discharge of the jury, nor did they, or either of them, ask for or reserve any bill of exceptions to the discharge."

As the plea was disposed of on demurrer, the facts in the case as to the proceedings on the alleged former trial must be taken as stated in the plea. It therein appears that the juror "I. W. Homan was ill (affected by bodily sickness and ill health), and thereby unfitted to perform his duty as one of the jurors of said jury at that day's session of said court, to wit, the session of the said 12th day of April, 1897"; that Homan attempted to perform his duties with the jury on the following day, the 13th of April, 1897, and that on the next succeeding day, April 14, 1897, the presiding judge announced to the defendants that he had information that the juror I. W. Homan would be unable to attend the trial on that day. The proposition of the district attorney to proceed with only 11 jurors, and the insistence of the defendants that they fully accepted that proposition, show that all the parties clearly understood that the juror was totally and permanently disabled from further bearing his part in the trial, and that he was already discharged from the jury, by the condition of his health. We are of the opinion that, notwithstanding the urgent willingness of the defendants to proceed with the trial with only 11 jurors, the trial judge, in the exercise of the sound discretion necessarily vested in him, did not err in discharging the other jurors, and adjudging a mistrial in the case. The reasons and additional facts set forth by the judge in the bill of exceptions, as above quoted, only strengthen the case by removing all grounds for argument on the subject. We think the settled practice in this country supports the action of the trial judge in this matter. Simmons v. U. S., 142 U. S. 148, 12 Sup. Ct. 171; Logan v. U. S., 144 U. S. 297, 12 Sup. Ct. 617.

In regard to dispensing with the reading in full of the indictment, the bill of exceptions bearing upon that matter shows that, when the proper time arrived to present the indictment to the jury (the counsel for the government addressing himself to the court thereon), the following proceedings were had:

"Mr. Curley: Now, if your honor please, I desire to state to the court that, instead of reading the entire indictment, every purpose will be answered, in my opinion, by reading certain of the counts of the indictment. The indictment consists of one hundred and thirty-six counts, one of which has been nolle prosequied; and each count charges embezzlement, abstraction or misapplication, and false entries. The defendants are charged with having embezzled, abstracted, and misapplied, in each instance, the same thing; that is to say, if it is a certain amount on a certain day, they are charged in separate counts,—in the one with having embezzled, in the other with having abstracted, and in the other with having misapplied that particular fund at that particular time. And therefore the reading of one of this character of counts will answer, in the opinion of the government, instead of reading each count just like it, which differs only in the amount and date; that explanation being made as the reading goes. Then, when it comes to the false entries, each false entry is charged in a number of different ways,—first, to deceive one officer, then to deceive another, for instance. Therefore the reading of one count concerning a false entry, and the explanation of what the difference is in the other counts, is, in the opinion of the government, sufficient; and I shall pursue that course, therefore, with

your honor's permission. The court allows the suggestion of the district attorney. Mr. Rouse: On behalf of Thomas H. Underwood, I desire to say that I cannot conceive of the possibility of the jury trying the issue under an indictment which is not read to them. I therefore except to the ruling of the court permitting the district attorney to read less than the whole indictment. The court rules as follows: As I understand it, the district attorney proposes to read the indictment in the manner which he has indicated. As I understand it, the defense objects, and insists that the whole indictment should be read. The defendants in a criminal case are entitled to know the nature of the accusation against them, and to have the indictment read to them. This right they can claim at a certain stage of the proceedings, namely, the arraignment. In this case the defendants have been arraigned, and have waived the reading of the indictment. Therefore they are charged with the full knowledge of what the indictment contains. In the opinion of the court,—the purpose for which the indictment would be read now being to inform the jury as to what the nature of the accusation is,—the court is satisfied the jury will have a much better and clearer understanding of the contents of this indictment if the course proposed to be followed by the district attorney is followed. The court repeats that it is satisfied that that course will result better, and more clearly inform the jury of the nature of this charge, than would the reading of this long indictment; consuming a considerable time, without a good result, in the opinion of the court. The court states that, if the defendants desire this indictment read in full, the right to do so is reserved and given to the defendants; and this indictment may be read, either by the defendants or through counsel, or any other course they may select."

Thereupon counts 1, 2, and 3 were read in full to the jury, when the counsel for the government, Mr. Gurley, said:

"I now explain to your honor and the jury that the three counts which have just been read in full are each in regard to the charge of the $6,000 check paid to Mr. Henry Gardes and others on May 7, 1894."

And, continuing, he remarked:

"I now further explain to your honor and the jury that counts 4, 5, and 6 are exactly like counts 1, 2, and 3, respectively, except that the date in those counts is May 29, 1894, and the sum is $5,000. I further explain to your honor and the jury that counts 7, 8, and 9 are exactly like the first three counts, respectively, except that the date in those counts is June 4, 1894, and the sum is $5,000."

And thus he proceeded through all of the sets of counts,—three on each transaction,—through and to the ninety-sixth count; showing the date of the transaction, and the amount on which each separate set of three counts of this part of the indictment was based. Still proceeding, he said:

"I further explain to the court and the jury that with count 96 the charges relative to embezzlement, abstraction, and misapplication end, and that with count 97 begins the charge relative to false entries. Each false entry is alleged in five counts."

Counts 97, 98, 99, 100, and 101 were then read in full to the jury, when the counsel for the government, addressing the court, said:

"I now explain to your honor and the jury that the difference in each one of these counts is as follows: Each charges, as I have explained, and as you have heard read, the making of these particular false entries on that particular day. The first of those counts, namely, count 97, charges that this act was done to deceive the officers of the said banking association, and to deceive any agent then appointed, or who might thereafter be appointed, to examine the affairs of said banking association, and with the intent to injure and defraud said banking association and other companies, bodies politic and corporate, and the individual persons then doing, or who might thereafter do, business with the said banking association. The next count, namely, 98, charges that it was done to deceive any agent who might be thereafter appointed by the comptroller of the currency

to examine the affairs of said banking association, the name of said agent being to the grand jurors unknown. The next count, namely, 99, charges that this act was done to injure and defraud the said association, and certain persons to the grand jurors unknown. The next count, 100, charges that the act was done to deceive any agent appointed to examine the affairs of said banking association. The next count, viz. 101, charges that Mr. W. W. Girault did make, and caused to be made, instead of charging that Mr. Girault did it alone, and Mr. Gardes and Mr. Underwood aided and abetted. It charges that Mr. Girault did make, and caused to be made, by one Arthur Christy, then and there a clerk of said banking association, in a certain book, and so forth; that Mr. H. Gardes and Mr. Thomas H. Underwood aided and abetted in that; and that these acts were done, as charged in the first count, namely, 97, to deceive the officers of said banking association, and to deceive any agent appointed, or who might thereafter be appointed, to examine the affairs of said banking association, and with intent of injury, and to defraud any bodies politic and corporate, and individual persons, then doing, or who might thereafter do, business with the said banking association. I now explain to your honor and the jury that counts 102, 103, 104, and 105 are exactly like counts 97, 98, 99, and 100, which were, respectively, just read to the jury, with the exception that the date is September 20, 1895, the sum $17,800, and the entry is charged to have been made on page 496 of note clerk's blotter No. 8, to the credit of Thos. H. Underwood & Co., N. Y., $17,800."

This course, with differing details, but exhaustive in its analysis of the different counts, was continued through all the sets of five counts on the different charges of false entry. And, though there is much more bearing on the same subject, this will, we think, clearly show to any one versed in such proceedings exactly what was done in lieu of the reading in full of the indictment to the jury. The consolidated indictment covers 607 pages of the printed record. To have read it in full would probably have consumed the session hours of four days of the term. Except as to the dates and amounts, which in each case, with reference to each count, were carefully and accurately stated to the jury, the language of the counts not read is identical with the language of those counts that were read,—technical to a high degree, and difficult for the trained practitioner to detect, from the reading by an ordinary reader, any difference between the one and the other of the counts, if they had been successively read, from No. 1 to No. 136. It is manifest to the mind of any one at all conversant with such proceedings that the manner pursued by the court, or permitted by the court, was, beyond measure, the best suited to carry to the minds of the jury an accurate knowledge of the gravamen of the charge in each count of the indictment. It is shown by the bill of exceptions that the defendants had been duly arraigned; that on their arraignment they had waived the reading of the indictment. Each of the plaintiffs in error, in his plea of former jeopardy, duly verified by his own oath, recites that he, in his own proper person, "comes into court here, and, having heard the said indictment read," etc. So it clearly appears, as we reasonably would have known the fact to have been, that the defendants were fully advised as to the contents of the charges preferred against them by the grand jury. If the course taken was not regular, it was certainly one that did the defendants no legal harm. As it was difficult to give the jury a clear idea of the different charges, it may have tended to dispel the doubt and confusion that would

have settled on the minds of laymen during the protracted and weary reading of the great volume of technical verbiage in which the charges were imbedded, and thus, to a degree, at least, have prevented the generation of that generally miscalled "reasonable doubt," which is the "last ditch" in which the guilty so often succeed in eluding the sword of justice. But this did the defendants no legal injury. They were clothed with the presumption of innocence. This presumption given to the jury as evidence was sufficient of itself to secure the defendants' acquittal, unless the government, by competent proof, established their guilt beyond a reasonable doubt. The government should therefore have been allowed, and should be encouraged, to use all proper means to free the minds of the jury from the confusion which the reiterated language of many similar indictments consolidated for trial, or very numerous counts in one indictment, is calculated to produce. In Agnew v. U. S., 165 U. S. 36, 17 Sup. Ct. 235, the chief justice, in discussing the question of irregularities presented in that case, after remarking thereon, and referring to authority in support of what he first advanced, added, "Another general rule is that for such irregularities as do not prejudice the defendant he has no cause of complaint, and can take no exception;" to support which the chief justice cites U. S. v. Richardson, 28 Fed. 61; U. S. v. Reed, 2 Blatchf. 435, 456, Fed. Cas. No. 16,134; U. S. v. Tallman. 10 Blatchf. 21, 28, Fed. Cas. No. 16,429; State v. Mellor, 13 R. I. 666; Cox v. People, 80 N. Y. 500; People v. Petrea, 92 N. Y. 128.

In reference to admitting certain testimony offered by the government to prove the intent and purpose of the parties, and in explanation of certain entries made in the books of the bank by the witness who was called to explain the same, we are satisfied from our inspection of the record that the trial judge did not err in overruling the objections made to the introduction of this testimony. It certainly is common knowledge that private entries made on the different folios of a system of books as extensive and complicated as the records of the transactions of a national banking association with a large capital must necessarily require that, for the proper understanding of the entries, the average juror is dependent upon the testimony of a witness conversant with that species of writing. Not only the average juror is dependent upon this testimony, but the most enlightened of the judges are thus dependent. And certainly one shown to have been employed and engaged in the making of the particular entries that were in controversy, and who made those about which he was examined, is at least a competent witness to testify on that subject, even though he may be not the best expert in existence. The testimony offered to show the intent and purpose of the parties was calculated, in connection with the other proof in the case, to aid the minds of the jurors in arriving at the truth. It was carefully limited strictly to the purpose to which it was applicable, and for which it was admitted. The jury were fully cautioned and charged, by appropriate instructions, repeated from time to time as occasion, during the tedious progress of the trial, seemed to require, as to the limits

of the application of this proof. The limitation of the use to be made of this proof was kept constantly before the jury, and carried forward into the court's final charge. It is clear to us that there was no error in the admission of this testimony.

In reference to the general verdict, its exact language is:

"We, the jury in the case of the United States vs. Walter W. Girault, Henry Gardes, and Thomas H. Underwood, find the following verdict:  W. W. Girault, guilty as charged; Henry Gardes, guilty as charged; Thomas H. Underwood, not guilty.                                     Chas. H. Bailey, Foreman.

"New Orleans, June 12th, '97."

We have seen, in U. S. v. Harper, supra, that Judge Jackson instructed the jury in that case that, if they were satisfied that the defendant was guilty on all of the counts in the indictment, they should return their verdict, "We find the defendant guilty as charged in the indictment." The verdict in this case is not literally in that form, but it is substantially such a verdict as Judge Jackson directed the jury to find in case the guilt of the defendant on each count was, in their judgment, established. The verdict in this case has direct relation to the charges in the indictment which the jury were impaneled and sworn to examine into, and a true verdict render thereon. It would seem that if the proof did in fact establish the guilt of the defendant on each of the counts in the indictment, and the jury's purpose was to so find, that purpose can be as clearly shown by a general verdict, as by a particular verdict on each count, the sum of which would amount to a verdict of guilty on each and every of the counts. So that the objection, if that was all there was to it, would be a dispute about words. It, however, appears from the language of the assignments which we have summed up in this suggestion of error that the defendants thereby intended to attack the validity of all of the counts in the indictment, and of each count separately, and of the several associated groups of the different counts. Without being led by this suggestion into a detailed analysis of the different counts, it is sufficient to observe that, of the counts remaining after the action of the court below on the motion in arrest of judgment, there is at least one count on each transaction sought to be charged as an offense which does charge the offense in apt and adequate language. And when we consider that the sentence against the defendants on each of the counts left standing in the indictment condemned them to a period of imprisonment on each for the same length of time, namely, eight years, and provided that the sentences should run concurrently, making the sentence practically equivalent to a sentence on one count for the period named, it is manifest that the objection to the verdict cannot be sustained on the ground of its supposed relation to any count in the indictment that should be held to be bad. There being in the indictment counts of each class that are good, the verdict, and the sentence thereon, relate to these good counts, without regard to the number thereof. And the fact, if it be a fact (as to which we express no opinion), that among the counts as to which the circuit court overruled the motion in arrest of judgment there are some that should be held to be bad, does not vitiate the verdict, or the sentence

thereon. Claassen v. U. S., 142 U. S. 140, 12 Sup. Ct. 169. In the case just cited Mr. Justice Gray says:

"In criminal cases, the general rule, as stated by Lord Mansfield before the Declaration of Independence, is that, if there is any one count to support the verdict, it shall stand good, notwithstanding all the rest are bad."

As to the refusal by the circuit court of certain charges requested by the defendant Girault, we do not deem it necessary to quote the language of these charges. So far as they were proper to have been given, they were fully embraced in the general charge, and in other special charges which were given by the trial judge to the jury, as shown in his memorandum made a part of the defendants' bill of exceptions No. 6.

We do not overlook the fact that the defendants, in their motion in arrest of judgment, rely strongly on the ground:

"That after the unlawful discharge of the said first jury impaneled in this cause, and before the unlawful impaneling of the second jury herein, rendering the verdict herein, at the instance of, or provoked by, the attorney representing the United States, the grand jury of this court, on its oath, made and presented to the court certain amendments of and to the indictment herein, whereby the same was, in some manner deemed by the United States attorney and said grand jury material, changed and amended in a material manner and in material averments; yet the said defendant was in no manner advised of said change in the indictment, nor called on or permitted to be newly arraigned under said newly-constituted and amended indictment, or to plead thereto; but, on the contrary, the government kept said change in said indictment in all things clandestine, and never notified this defendant of said amendments and change of and in said indictment; and, as appears by the record herein, said indictment, as so amended, stands without any lawful issue thereon, or any arraignment of this defendant under said indictment as so amended; it appearing from the record therein that there was and is no plea of this defendant to said amended indictment, and that no opportunity to so plead thereto was ever given to this defendant, as in justice and law should have been done."

It appears from the record that on April 24, 1897, the grand jury came—

"Into open court, and upon their oath, with leave of court, presented the following amendments to the indictment presented herein against Walter W. Girault, Henry Gardes, and Thomas H. Underwood on the 11th day of March, 1897, and filed in this court upon that date, viz.: At the commencement of counts 4, 7, 10, 13, 16, 19, 22, 25, 28, 31, 34, 37, 40, 43, 46, 49, 52, 55, 58, 61, 64, 67, 70, 73, 76, 79, 82, 85, 88, 91, and 94, and just before the word 'present,' insert the words, 'And the grand jurors aforesaid, upon their oath aforesaid, further'; the same having been inadvertently omitted from said respective counts in said indictment."

On the 17th of May, thereafter, the defendants presented their plea of former jeopardy, to which we have before alluded, which plea by each says that he—

"In his own proper person comes into court here, having heard the said indictment read, and now and at all times protesting that he is not guilty of the premises charged in said indictment, or charged in any count or counts contained in said indictment, saith," etc.

From the judgment of the court on the defendants' motion in arrest of judgment we excerpt the following:

"Whereupon, and on due consideration thereof, it is ordered by the court that the said motions in arrest of judgment be sustained as to all the counts in the indictment amended by the grand jury on April 24, 1897, said counts being

numbered [as above given], and that the said motions in arrest of judgment be overruled in all other respects."

The amendments made or attempted to be made to the certain counts in the indictment did not affect the body of either of each specified count. It made no change whatever in the charging words. The changes made or attempted to be made were in what is properly called the "caption" of the indictment or count; for in this sense, as in many others, each count is a separate indictment. If the defendants are not estopped, by their admission in their plea of former jeopardy, as above quoted, from thereafter urging that they had not been arraigned under the indictment to which they pleaded, and if the attempted amendment, being, not in the body or charging part of the indictment or count, but in what we think may properly be called the "caption" thereof, and strictly pro forma, can be held to be material, under the authority of Ex parte Bain, 121 U. S. 1, 7 Sup. Ct. 781 (which we think it cannot), it could only affect the counts attempted to be amended, on each one and on all of which counts, as we have seen, judgment was arrested.

We have thus considered, after our own order, the questions which appear to us to be involved in the assignments of error, and find not sufficient in any of them to warrant us in reversing the judgment of the court below. We find, however, on the face of the record, an error not assigned, so far as we are able to construe the assignments of error, which does not require the reversal of the judgment, but which seems to us to require a modification of the sentence. The section of the statute under which these indictments were found provides that persons convicted of the offenses therein named "shall be imprisoned not less than five years nor more than ten." The sentence in this case is that the defendants (naming them) shall "be conveyed to, and be imprisoned at hard labor in, the Ohio penitentiary, at Columbus, in the state of Ohio, for and during the term and period of eight years; the sentences to run concurrently." Section 5541, Rev. St., provides that, where any person convicted of an offense against the United States is sentenced to imprisonment for a period longer than one year, the court by which the sentence is passed may order the same to be executed in any state jail or penitentiary within the district of the state where such court is held, the use of which jail or penitentiary is allowed by the legislature of the state for that purpose. Section 5542 relates specially to persons convicted and sentenced to imprisonment and confinement at hard labor, and has the same provision in reference to such persons being sentenced to the penitentiary. The language of the two sections, except in describing the punishment, is substantially identical. In reference to both classes of persons it is provided that, when the offender is imprisoned in a jail or penitentiary of any state or territory, such offender shall in all respects be subject to the same discipline and treatment as convicts sentenced by the courts of the state or territory in which such jail or penitentiary is situated, and, while so confined therein, shall be under the exclusive control of the officers

having charge of the same under the laws of such state or territory. Section 5546 provides for selecting a suitable jail or penitentiary in a state other than that in which the court is held, when the use of no suitable jail or penitentiary can be procured in the latter state, in which case the prison to be used shall be designated by the attorney general; and the prevalent practice under these provisions has obtained, in accordance with which the attorney general notifies the different courts, through the district attorney, of the designation that he has made for the different districts from time to time, and procures to be entered upon the minutes of the courts in each district an order showing the designation which is in force. These provisions of the statute are fully discussed by the chief justice in Ex parte Karstendick, 93 U. S. 396, and are construed to widen the range of punishment in all cases where any person may be sentenced to imprisonment for a longer period than one year, and to authorize the court, at its discretion, to order execution of its sentence at a place where labor is exacted as a part of the discipline and treatment of prisoners held in the institution. At the time of the passage of the acts from which these sections of the Revised Statutes were drawn, it was the law in most, if not in all, of the states, that persons convicted of offenses, and sentenced to imprisonment in the penitentiary, were sentenced to imprisonment at hard labor. Such labor, therefore, was a part of the uniform discipline and treatment of all convicts therein held; and the statute requiring the subjection of the United States prisoners to the same discipline and treatment, and to the exclusive control of the officers having charge of the prisoners, would involve, necessarily, the doing of hard labor by the convict during the term of his imprisonment in such a penitentiary. The circuit court doubtless had knowledge that the discipline and treatment of prisoners in the Ohio penitentiary enjoined their being held at hard labor, and that persons sentenced to a period of eight years' confinement in that prison would be required to submit to that discipline and treatment. We think, however, that there is a substantial difference between having to submit to hard labor as a part of the discipline and treatment in the state penitentiary to which by statute the courts are authorized to sentence convicted offenders, and the having pronounced against them a sentence to hard labor, as a brand or mark of the grade of their punishment for the offense. The statutes of the United States require in some cases that the sentence shall be to confinement at hard labor. They provide in other cases that the punishment may be imprisonment for more than a year, without adding the words "at hard labor." It may be difficult to perceive, and more difficult to accurately express, the distinction which we suggest; but we believe there is a material distinction in the public thought between a sentence to confinement at hard labor, and a sentence to confinement in a designated state penitentiary, where hard labor will be required of the person sentenced, as a part of the discipline of the prison. "At the present day, imprisonment in a state prison or penitentiary, with or without hard labor, is an infamous pun-

ishment"; and, "by the express provisions of acts of congress, either a sentence 'to imprisonment for a period longer than one year,' or a sentence 'to inprisonment and confinement to hard labor,' may be ordered to be executed in a state prison or penitentiary" (Mackin v. U. S., 117 U. S. 348, 6 Sup. Ct. 777), and thus in either case stamp the convict with the stigma of subjection to an infamous punishment. Still we think that the embodying in the sentence the words "at hard labor" gives the stigma an emphasis which the statute does not require in this case. We conclude, from a careful consideration of the subject, that the sentence should not go beyond the language of the statute in describing the character of the confinement, and we modify the sentence in this case by striking out the words "at hard labor." And as thus modified the judgment appealed from is in all things affirmed.