PROVO STY, J.
The plaintiff alleges that he purchased for $3,500, from one Lawrence, 35 shares of stock of the Southern Fiber Company, a corporation organized under the laws of Maine; that said company claims that said stock is counterfeit; and that said company is liable in solido with said Lawrence for .the said amount paid by petitioner for the said counterfeit stock for the following reasons:
“First. That said Southern Fiber Company held out and represented said Abbott W. Lawrence as its president, agent, and representative, placed in his hands certificates of stock and the seal of the said corporation, and thus enabled him to defraud plaintiff out of the sum of $3,500, the price paid for said stock, evidenced. by said forged certificate. That said Southern Fiber Company is liable for the fraud of its president and for his acts and doings; they having placed it in his power to cheat and defraud plaintiff, and are therefore liable in solido with him for said amount.
“Second. That said Southern Fiber Company, by its acts and doings, aided, abetted, and assisted the said Abbott W. Lawrence in defrauding plaintiff out of said amount of $3,500 paid to him for said stock, now appearing to be fraudulent and fictitious.
“Third. That, although aware of the fraudulent acts and doings of said Abbott W. Lawrence; the said Southern Fiber Company retained him in its employ as president, concealed and covered up his frauds, thereby holding him out to the public as honest and trustworthy, and enabling him to cheat and defraud plaintiff by selling and delivering to him the said forged certificate of stock, which plaintiff alleges to be forged and fictitious.”
Plaintiff annexed, and made part of the petition the following exhibit:
“New Orleans, May 1, 1905.
“Received from Rufus W. Rogers, thirty-five hundred dollars, in full payment for thirty-five shares of Southern Fiber Company stock, certificates to be delivered.
“(Signed) Southern Fiber Company,
“A. W. Lawrence, Pres.”.
Alleging that Lawrence had absconded, plaintiff asked for an attachment, and asked for garnishment process against one Tennant Lee. The latter denied owing Lawrence anything, or having in his possession any property of his. Plaintiff traversed the answers.
The company filed an exception of no cause of action. This exception was referred to-the merits. With reserve of this exception, the company answered to the merits, denying *717 tooth generally and specially the allegations ■of the petition.
There was judgment condemning Lawrence .and the company in solido to pay the $8,500, .and condemning the garnishee to pay $3,000; .and these parties have appealed.
The sum of the complaint against the defendant company, as contained in the petition, is that, although said company knew, from the fraudulent conduct of Lawrence in ■the past, that he was an untrustworthy person, yet it continued him as its agent and .president, and confided to him certificates of its stock and its seal, thereby holding him out to the world as a trustworthy person, and .aiding, abetting, and assisting him in his fraud.
These facts, if taken for true, would not, in our opinion, make • the defendant company liable. The proposition is a plain one that a -corporation, like an ordinary person, is only responsible for those acts of its agent which .have been done in its name, not for those which have been done in the agent’s own individual name. The latter acts are the .agent’s own, and, no matter what their nature may be, whether sales of corporation stock, or of live stock, or horse trades, he .alone is responsible for them.
There is no allegation in the petition that the selling of certificates of stock, or the is.suing of certificates of stock, or the receiving ■of money for subscriptions of stock, came within the scope of the functions of Lawrence .as agent and president of the defendant company ; but, even if the petition had contain•ed such an allegation, still it would not have shown a cause of action, so long as it ■continued to allege that Lawrence was acting for himself and in his own individual .interest in the transaction.
“It is an old doctrine, from which there has never been any departure, that an agent cannot •bind his principal even in matters touching his agency, where he is known to be acting for himself, or to have an adverse interest. [Authorities.] '* * * The plaintiff in such a case assumes the risk of the agent’s disloyalty to his trust, and has no occasion for surprise when he discovers that the agent has served himself more faithfully than his principal.” Manhattan Life Ins. Co. v. Forty-Second St. & G. St. F. Co., 34 N. E. 776, 777, 139 N. Y. 146.
“When purchaser from corporate officer bound to investigate his authority. One who accepts newly issued certificates of stock from an officer of a corporation, who has authority from the corporation to sign, seal, and issue for the corporation certificates of its stock, as collateral security for a personal loan made to the officer, is bound to inquire whether- the officer has authority to issue the certificates for the purpose intended; and, if he does not make such inquiry and the officer in fact issues them in fraud of the rights of the corporation, he takes them subject to those rights.” Thompson, Corporations, vol. 2, § 2606.
“An agent cannot properly act for his principal when their interests are adverse; and any person dealing with an agent in a matter affecting his principal, and knowing that the interests of the agent are adverse to those of his principal, ought to be held to the duty of ascertaining that the acts of the agent are authorized by the principal.” Farrington v. South Boston R. Co., 150 Mass. 406, 23 N. E. 109, 5 L. R. A. 849, 15 Am. St. Rep. 222.
“One purchasing stock, even from an officer of a corporation having power to issue certificates of stock, is put upon inqxxiry as to his authority to bind the corporation, if the officer is dealing for himself personally or has an interest adverse to his principal. If the purchaser fails to make such inquiry, he deals with the officer at his peril, is not an innocent purchaser, and assumes the risk of the agent’s disloyalty to his trust.” Clark & Marshall on Corporations, vol. 3, § 711b; Thompson on Corporations, vol. 2, § 2606; Manhattan Life Ins. Co. v. Forty-Second St., etc., R. R. Co., 34 N. E. 776, 777, 139 N. Y. 146; Farrington v. South Boston R. Co., 150 Mass. 406, 23 N. E. 109, 5 L. R. A. 849, 15 Am. St. Rep. 222; Moore v. Bank, 111 U. S. 156, 4 Sup. Ct. 345, 28 L. Ed. 385; Wright’s Appeal, 99 Pa. 426; Thompson on Corporations, vol. 2, § 2600.
The lower court should have sustained the exception of no cause of action, and dismissed the suit of plaintiff.
The learned counsel for plaintiff argues the case as if the transaction in question, instead of having been with Lawrence individually, as is distinctly alleged in the petition, had been with the defendant company through Lawrence acting as its president. He contends that the evidence shows that the transaction was with the company, and that this evidence has had the effect of en *719 larging or changing the pleadings; it having been admitted without objection.
The learned counsel loses sight of the fact that the defendant company did not file an answer to the merits until forced to do so by the court, and that even then it did so only with full reserve of the exception of no cause of action. “Actus curiae neminem gravabit” Therefore the case must first be dealt with on this exception of no cause of action; that is to say, without consideration of the evidence in question which came into the case only on the trial on the merits.
I-Iad the lower court sustained the exception and dismissed the suit, it would have saved itself and this court a good deal of unnecessary trouble; and perhaps the more sensible — certainly the more logical — course for this court now to pursue would be simply to sustain said exception and dismiss the suit and say nothing further. But the case having been fully tried and argued, it will be more satisfactory to the parties if the whole of it is passed on. But the court will again take occasion to exhort trial courts to try exceptions of no cause of action before, not after, the merits.
In dealing with the merits, the first question which arises is whether the pleadings have been changed by evidence admitted without objection. We think not. For two reasons:
First, that a litigant who has interposed an exception of no cause of action, and only consented to file an answer when forced to do so by the court, and even then only with full reserve of the exception, as did the defendant company, cannot be presumed to have consented to such a change in the petition as would make it show a cause of action.
Second, that an enlargment of the pleadings by the reception of evidence without objection takes place only when the evidence was not admissible under the pleadings (McAdam v. Soria, 31 La. Ann. 861; Choppin v. Dauphin, 112 La. 127, 36 South. 287), and) that the evidence to which the learned counsel refers as having been admitted without objection was thus admissible; it consisting of the documents executed in connection with the transaction upon which the suit is founded, and of the testimony of plaintiff touching the same transaction, all of which had necessarily to be admitted on the trial of the case on the merits.
Conceding, however, argument! gratia, that the pleadings were changed, and that the allegation of the petition is that the plaintiff intended to deal with the company, and not with Lawrence individually, and thought he was doing so, how does the case stand?
The plaintiff testified in chief, as follows:
“Lawrence came to me and said that he had 35 shares of stock he would like to sell of the company; he would like to get some one in who would take the whole block of 35 shares, and he asked me if I would take them.”
But, on cross-examination, plaintiff testified that he understood that he was dealing with the company.
The check which he gave was in favor of “A. W. Lawrence (Pres. Southern Fiber Company).” It was indorsed: “Southern Fiber Co., A. W. Lawrence, Pres.” The receipt given for it has already been transcribed above. It was in the name of the company.
At the giving of this check, the parties-executed a document by which Lawrence, individually, promised to pay plaintiff $3,500' in six months, with 5 per cent, interest from date, for the same stock, in case plaintiff wished then to dispose of it, and this contract, at its maturity, was renewed for one-year.
Plaintiff made no demand for the delivery of the stock, and made no inquiry whatever until some eight months thereafter, when Lawrence delivered to him the bogus stock.
The defendant company, as already.stated, is organized under the laws of Maine. Its- *721 domicile was in Boston, Mass. It did business in New Orleans, where it had a mill and an office. Lawrence was its president. His powers, as prescribed by the by-laws and resolutions of the company, were:
“First, to preside, when present, at all meetings, either of the board or of the corporation; second, to sign, when present, all certificates of stock; third, to perform other duties incident to his office prescribed by law, by the by-laws or by special resolution of the board; fourth, to be custodian of the treasurer’s bond; fifth, to lease and manage the office of the company in New Orleans, and to keep accounts and reports of the work done and material bought, and to send them to the treasurer from time to time, as he may desire, to arrange for the purchase of bagasse at a cost not over three dollars per ton delivered at the mill, to arrange for the transfer of the land purchased, and to arrange a contract for the oil supply authorized.”
He did not havé, and never exercised, so far as the company knew, any powers except as here prescribed; he never had, and, so far as the company knew, never exercised, any authority to receive or accept money for the company, or to indorse checks in its behalf. ' He never had charge or control of, or access to, the funds of the company, or to its stock book or blank certificates of stock or to its seal. All of these matters were confided to and exercised by other officers at the domicile of the company in Boston. The company knew nothing of the untrustworthiness of Lawrence until after the transaction with plaintiff. It received not one cent of plaintiff’s money, and in no way profited by it.
Article 273 of the Constitution of this state provides:
“Every railroad or other corporation, organized or doing business in this state, under the laws or authority thereof, shall have and maintain a public office or place in this state for the transaction of its business, where transfers of stock shall be made, and where shall be kept for public inspection books in which shall be recorded the amount of capital stock subscribed, the names of owners of stock, the amounts owned by them respectively, the amount of stock paid, by whom, the transfers of said stock, with date of transfer, the amount of its assets and liabilities, and the names and places of residence of its officers.”
The defendant company had not complied with this constitutional requirement. All it had done was to file a copy of its charter with the Secretary of State, and keep in its New Orleans office a copy of its charter and by-laws. The duties and powers of its officers were not prescribed in the charter, but in the by-laws.
The counterfeit stock delivered to plaintiff was of Lawrence’s own private manufacture and was in his name. It was not on one of the blank certificates of the company, and did not resemble the genuine stock of the-company. The seal was not that of the company, and the signature of the secretary and treasurer of the company on it was a forgery.
From the foregoing facts it is not clear beyond question that the shares of stock which were to be transferred to plaintiff were not such as belonged to Lawrence individually. Plaintiff’s statement is that Lawrence said that “he”, i. e., he, Lawrence, individually, had 35 shares of stock, which “he”, i. e., he, Lawrence, individually, would like to “sell.” This would clearly indicate that the transaction was not one by which plaintiff was to subscribe to the stock of the defendant company, and for which purpose he confided funds to Lawrence as president of the company; but that it was one by which Lawrence individually was to sell to plaintiff 35 shares of stock — and the latter version is corroborated by the document which Lawrence executed in his individual name for the redemption of the stock, and by the fact that the stock which was delivered and which plaintiff accepted was in the name of Lawrence.
Nor is it clear that the laches of plaintiff in suffering seven or eight months to elapse without demanding the delivery of the stock, or even making inquiry, does not cut him off from any equity he might have had to hold the defendant company responsible.
*723 But, waiving the latter point, and assumang that plaintiff understood that he was dealing with defendant company through its president, and not with Lawrence individually, still the defendant company is not liable. The learned counsel for plaintiff would seek to hold the defendant company liable on those principles of estoppel 'by which a corporation is liable where its officer, having authority to issue genuine stock, has defrauded an innocent subscrib>er by issuing counterfeit stock, and where a corporation allows an officer, habitually •and in the face of the public, to perform for it and in its name certain acts, and a member of the public innocently parts with value ■on the faith of the officer having authority in the premises. But these principles are inapplicable, since, upon the foregoing facts, Lawrence did not have authority to issue the genuine stock of the company, and was not held out by the company as having •any such authority, and was not in the habit of receiving subscriptions for stock, or •of dealing in any way with the certificates ■of stock of the company, or of receiving money in its name or for its account
The law thus cited by the learned counsel for plaintiff is as follows:
“The fact of forgery does not extinguish his right when it has been perpetrated by or at the instance of an officer placed in authority by the corporation and intrusted with the custody of its stock books and held out by the company as the source of information on the subject.” Clark on Corporations, p. 525; A. & E. E. of Law (2d Ed.) tit. “Stock & Stockholders,” vol. 26, p. 875.
“Extension of authority by holding out: As in the case of other agents, the president of a .corporation may acquire larger powers than those ordinarily belonging to him by being held out to the public as possessing them, and by being suffered by the directors habitually to exercise such powers in the face of the public.” •Cyc. vol. 10, p. 912.
The above quoted excerpt from Clark on •Corporations is not as explicit as might be wished. The A. & E. E. Ioc. cit is more explicit. It begins:
“Where an officer of a corporation having authority to issue valid certificates,” etc.
As was said by the Supreme Court of the United States in Moores v. Cit. Nat. Bank, 111 U. S. 156, 4 Sup. Ct. 345, 28 L. Ed. 388:
“None of the cases cited by the learned counsel for plaintiff affirm a broader proposition than this: A certificate of stock in a corporation, under the corporate seal, and signed by the officers authorized to issue certificates, estops the corporation to deny its validity as against one who takes it for value with no knowledge or notice of any fact tending to show that it has been irregularly issued.”
It is thus made clear that, before the corporation can be made liable in any way for the act of its officer in issuing counterfeit stock, the officer must be shown to have had authority to issue genuine stock; and the above-quoted excerpt from Cyc. is explicit to the effect that the corporation is liable for the act of its unauthorized officer only when he had been suffered to exercise such powers “habitually in the face of the public.” In the instant case, not only is it not shown that Lawrence was suffered habitually to issue the stock of the defendant company, or to receive subscriptions to its stock, or to receive money in any way for the company, but the very opposite is positively and clearly established.
The utmost that plaintiff can say against the defendant company is that Lawrence was its president; but a corporation is not liable for every act the man who is its president may do. The law regarding the implied powers of the president of a corporation is very fully and satisfactorily stated in 10 Cyc. 903 et seq., and what is there said shows very clearly that the president of a corporation has, not, simply virtute officii, the implied power of bonding it by a fraudulent issue of its stock, or by receiv *725 tag money in its name to be invested in its ■stock.
Tbe learned counsel for plaintiff charges ■the defendant with having ignored the .above-quoted article of the Constitution; but what if defendant did? That article does not say that a corporation which fails to -do the things there prescribed shall be liable for the fraudulent acts of its president.
We conclude that the defendant company is not liable, and we pass to a consideration ■of the case as against the garnishee, Tennant Lee.
The latter was an occupant of the office ■of the defendant company in New Orleans with Lawrence up to the time of the defalcation of Lawrence. Exactly in what capacity does not appear. He had charge of the office from and after the disappearance •of Lawrence. Lee made an affidavit against Lawrence on February 13th, charging him with the forgery of the stock held by plaintiff, and Lawrence was seen no more from that day. On that day, a Times-Democrat reporter interviewed Lee; and, as the result of the interview, published in the issue of the paper of the next day (14th) the following statement:
“Mr. Lee said that $3,000 of good stock belonging to Mr. Lawrence had been found, and was in the possession of the company. If this and any other property belonging to Lawrence that might fall into the company’s hands could 'be legally prorated among the purchasers of bogus stock, it would be done.”
Plaintiff and his then attorney, who had ■called to see Mr. Lee, overheard a part of this interview while they were waiting in an adjoining room. Plaintiff’s then attorney says that he heard Lee say to the reporter that:
“Mr. Lawrence had $3,000 worth of stock in the company and that he was going to prorate It among the creditors.”
Between the statement of the reporter and that of the attorney the following discrepancies are to be noted:
Reporter.
1. Good stock.
2. Had been found and was in the possession of the company.
3. If this or any other property "that - might fall into the company’s hands could be legally prorated, it would be done.
The Attorney.
1. Stock in the company.
2. (Does not say in whose possession the stock was.)
3. He' (Lee) was going to prorate it among the creditors.
After the interview with the reporter was concluded, plaintiff and the attorney had a conversation with Lee. We put side by side plaintiff’s and the attorney’s statements regarding what Lee said in this conversation.
Plaintiff. Mr. Lee said he had gone up to Mr. Lawrence’s house to get hold of $3,000 worth of stock and that he was holding that for the company to prorate among the people who had been swindled; he was holding it for the company, not for himself for the company.
The Attorney. He said he had gone to his house and had $3,-000 stock in his possession, and that he was holding it to prorate among the creditors.
Q. Did Mr. Lee toll you that he had $3,000 of stock personally in his hands? A. Ye^, sir. Q. Personally? A. Yes, sir.
The two statements disagree upon the very material point of whether Lee said that the company was holding the stock, or that he (Lee) was holding it personally.
The attorney says that the plaintiff and Rogers left the office together, and that when they got to the street, and while plaintiff was talking to another person, Lee told witness that:
“Rogers was bound to get something out of th,at stock.”
Lee’s statement of the matter is as follows :
“Well, this was it: Mr. Lawrence came in and told me he had this stock in his possession at the time, and that, if we would publish something which would not look so bad in the paper, he would give that up to any one we named, in case there was anybody that the stock was due to. I says: ‘I cannot. I must transmit this’ — and I did so. During the morning this thing came out, he said: ‘Have you heard from Boston?’ I says: ‘I have not.’ He told me to come up there — this was a day we later on found out of his crookedness — and I did so, and Mr. Lawrence said he had this stock in his possession. I asked the district attorney to seize the stock. I thought the detectives could seize that stock. I supposed that could be done. I am no lawyer. And that is *727 what I stated at the interview, that undoubtedly that stock would be seized and held for the good of the people. I would be the last man in the world he would give stock to, as he owed me money.
“Q. As I understand, then, you were merely repeating what Mr. Lawrence told you?
“A. Tes, sii1.
“Q. And that is the way these parties were misled?
“A. That is the way they were misled about it.”
There cannot be any doubt of the sincerity of all these statements, and the conclusion is inevitable that Lee was misunderstood.
Judgment set aside, and suit dismissed.