(78 South. 582)

No. 22493.

UNION NAT. BANK v. UNITED STATES FIDELITY & GUARANTY CO.

(Feb. 25, 1918. Rehearing Denied April 29, 1918.)

(Syllabus by the Court.)

1. APPEAL AND ERROR ⊕⟶840(4) — APPEALABLE ORDERS — OVERRULING ON EXCEPTION OF NO CAUSE OF ACTION.

An exception of no cause of action which has been overruled in the trial court and all rights thereunder have been reserved by defendant in its answer, may on appeal by defendant be argued and considered in the appellate court.

2. NATIONAL BANKS — EMBEZZLEMENT BY CASHIER—STATUTE.

"Any cashier, * * * who embezzles, abstracts or willfully misapplies any of the moneys, funds or credits of the association [a national bank] * * * shall be imprisoned not less than five years nor more than ten." Rev. St. U. S. § 5209 (Comp. St. 1916, § 9772).

3. BANKS AND BANKING ⊕⟶256(3)—NATIONAL BANKS — EMBEZZLEMENT BY CASHIER — ELEMENTS—INTENT TO DEFRAUD.

"The crime of embezzlement from a national bank by an officer, clerk, or agent, within Revised Statutes, 5209, involves two general elements: one a breach of trust or duty with respect to the moneys, funds, or credits of the bank embezzled, which must have been lawfully in the custody or possession of the accused by virtue of his office or employment, although such possession need not have been exclusive of that of other officers, clerks, or agents; and, second, wrongful appropriation of such moneys, funds, or credits to his own use, with intent to injure or defraud the association or others. * * *

"The intent to injure or defraud * * * need not necessarily have been the object or purpose with which the act was done; but it is sufficient if the natural and necessary effect of the act was to injure or defraud the bank or others, and it was willfully and intentionally done." United States v. Breese (D. C.) 131 Fed. 915; United States v. Heinze (C. C.) 161 Fed. 425.

4. BANKS AND BANKING ⊕⟶256(3)—NATIONAL BANK—EMBEZZLEMENT BY OFFICER.

The embezzlement or "misapplication of the funds of a national bank by an officer without the knowledge or consent of the bank * * * is not changed, as to its criminal character, by the fact that the act subsequently became known to the officers of the bank, and that they impliedly consented thereto, by taking no action in regard to it." Rieger v. United States, 107 Fed. 916, 47 C. C. A. 61.

5. EMBEZZLEMENT ⊕⟶1—DEFINITION.

"Embezzlement is the fraudulent appropriation of property by a person to whom such" property "has been intrusted, or into whose hands it has lawfully come." Moore v. United States, 160 U. S. 268, 16 Sup. Ct. 294, 40 L. Ed. 422; State v. Roubles, 43 La. Ann. 200, 9 South. 435, 26 Am. St. Rep. 179.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Embezzlement.]

6. BANKS AND BANKING ⊕⟶256(3), 257(3) — NATIONAL BANK — EMBEZZLEMENT — EVIDENCE.

"As evidence that overdrafts on the bank by its president were made with intent to abstract or misapply its funds it may be shown that at the time of the overdrafts it was hopelessly insolvent, that this was due to its assets being notes of wholly irresponsible persons, and that these notes had been used by the president in connivance with the cashier, who was the director, and another director to give him fictitious credit.

"The acts and intent of the president * * * in obtaining money * * * on worthless securities being such as to make him guilty of embezzlement, abstraction, or willful misapplication of its funds it is immaterial that his acts were committed, sanctioned, or ratified by the other officers of the bank, with knowledge of the facts." Breese v. United States, 106 Fed. 680, 45 C. C. A. 535.

(Additional Syllabus by Editorial Staff.)

7. PRINCIPAL AND SURETY ⊕⟶155—FIDELITY BOND—CAUSE OF ACTION—PETITION.

A petition alleging that the cashier of a national bank abstracted its money in his pos-

session and control, and converted it to his own use to the pecuniary loss of the bank, and that such acts amounted to an embezzlement, stated a cause of action against the surety on his bond conditioned to make good and reimburse the bank for any loss by reason of the fraud or dishonesty of the cashier in connection with the duties of his office amounting to embezzlement or larceny.

8. PRINCIPAL AND SURETY ⬡⟿155 — ACTION ON SURETY BOND—PETITION.

A petition in an action against the surety on the bond of the cashier of a national bank covering his embezzlement or larceny need not be phrased in the technical language which would have been used in an indictment or information charging embezzlement or larceny.

9. PRINCIPAL AND SURETY ⬡⟿79 — FIDELITY BOND—EMBEZZLEMENT BY CASHIER OF NATIONAL BANK.

In a suit against the surety on the bond of the cashier of a national bank, conditioned to reimburse the bank for any loss from his fraud or dishonesty amounting to embezzlement or larceny excepting liability for his acts or omissions under instructions from his employer, or for any mere error of judgment or bona fide mistake, evidence that he was a stockholder, a director, and a member of its board, and indorsed notes of concerns in which he was a stockholder or officer and which he knew to be insolvent, and discounted notes of such concerns and his own notes without proper security, and overdrew his own account and borrowed a mortgage note for a few days so as to attach it temporarily to one of his own so as to have his note discounted and abstracted a bill of lading attached to a draft for collection and gave it to the consignee, a company with which he was connected, without collecting the draft, all without instruction from his employer or superior officer, showed an embezzlement, and not a mere error of judgment or bona fide mistake.

Appeal from Sixth Judicial District Court, Parish of Ouachita; Ben C. Dawkins, Judge.

Action by the Union National Bank, by H. F. Thomas, receiver, against the United States Fidelity & Guaranty Company. Judgment for plaintiff, and defendant appeals. Judgment affirmed in favor of the People's Investment Company, Incorporated, substituted for plaintiff.

Stubbs, Theus, Grisham & Thompson, of Monroe, and J. Zach Spearing, of New Orleans, for appellant. Hudson, Potts, Bernstein & Sholars, of Monroe, for appellee.

SOMMERVILLE, J. May 10, 1907, the defendant executed a bond as surety of H. D. Apgar, cashier guaranteeing the Union Bank & Trust Company in a sum not to exceed $10,000 that it would—

"make good and reimburse to the said employer by reason of the fraud or dishonesty of the said employé in connection with the duties of his office or position amounting to embezzlement or larceny and which have been committed during the continuance of said term, or of any renewal thereof."

The bond further provided that the defendant shall not be liable—

"for any act or thing done or left undone in obedience to or in pursuance of any instructions or authorization received by him (Apgar) from the employer or any superior officer or for any mere error of judgment or bona fide mistake, or any injudicious exercise of discretion on the part of the employé (Apgar) in or about all or any matters wherein he shall have been vested with discretion," etc.

The Union Bank & Trust Company was, on March 4, 1912, nationalized, and became the Union National Bank, and the bond was renewed from year to year, until the bank was closed by some one connected with the national banking affairs of the government; and this is a suit by the receiver against the defendant as surety or guarantor on said bond for the full amount thereof.

The petition is long, and it would serve no useful purpose to refer to each one of the 42 articles contained in it.

It recites numerous transactions by notes, indorsements, renewals, and overdrafts by which Apgar, while acting as cashier of the bank, became indebted to the bank in a sum far in excess of the amount of the bond.

Defendant filed an exception of no cause of action, which was overruled. It then answered that the matters charged against Apgar were not fraudulent and dishonest, and did not amount to "embezzlement or larceny" of the funds of the bank. Further, that what was done by Apgar was with the authorization of the other officers of the bank; or they were errors of judgment; bona fide mis-

takes; or that the indebtedness was the result of an injudicious exercise of the discretion which had been vested in him.

There was judgment for plaintiff for the full amount of the bond, and defendant has appealed.

Defendant has filed the following assignment of errors in this court:

(1) The district court erred in not sustaining the exception of no cause of action.

(2) The district court erred in holding that the evidence showed that H. D. Apgar had committed any act of "fraud or dishonesty" in connection with his position or office as cashier "amounting to embezzlement or larceny," or that the evidence shows any want of authorization by the board of directors or superior officers to make the loans complained of; but, on the contrary, the evidence shows affirmatively that the principal, H. D. Apgar, committed no crime "amounting to embezzlement or larceny," and that the testimony shows affirmatively that the loans complained of, both by overdrafts and notes, were made with the authorization and approval of the superior officers and board of directors, and that while many of the loans were probably injurious to the bank, they were "the injudicious exercise of discretion on the part of the employé," which acts are specially exempted from liability under the terms of the bond.

[1] Plaintiff objects to the consideration by the court of the exception filed by defendant. The exception was overruled, and in its answer defendant reserved its rights thereunder. It is therefore properly before the court. It is peremptory in its nature, and, as such, might have been filed at any time in the course of the proceedings. Rogers v. Southern Fiber Co., 119 La. 714, 44 South. 442, 121 Am. St. Rep. 537.

Plaintiff refers to the case of Lykiardopoulo v. New Orleans & C. R., Light & Power Co., 127 La. 314, 53 South. 575, Ann. Cas. 1912A, 976, in support of its position. It has

no application here. A ruling on an exception of vagueness, and not on a peremptory exception, was therein disposed of.

The bond sued on was attached to and made part of the petition, and the two documents will be considered together in considering the exception.

Assuming the numerous irregularities resulting in heavy loss to the bank, and detailed in the petition, to have been practiced by Apgar, defendant argues that they did not amount "to embezzlement or larceny" on his part, and that it is not alleged that Apgar was not authorized to do the things enumerated in the petition by his employer or any superior officer, or that any of the alleged misappropriations were not authorized, or that there were errors other than errors of judgment and mistakes, or that those things were done without the consent of the bank.

[7] We are of the opinion that the transactions of Apgar enumerated in the petition, taken together with article 40 thereof, shows a cause of action against defendant on the bond issued by it to make good and reimburse the bank for any loss "by reason of the fraud or dishonesty of the said employé in connection with the duties of his office or position amounting to embezzlement or larceny," and which were committed during the continuance of the bond, to the extent of $10,000.

The said article 40 of the petition is as follows:

"Petitioner shows that the said Harvey D. Apgar (for himself and the above-named partnerships, of which he was a member, and his copartners thereof, and W. B. Clarke) did, on the several dates alleged, take and abstract the aforesaid and respective sums of $23,433.65, $4,800, $1,325.78, $3,207.92, $3,250, $2,500, $2,-314.50, $876.95, and $17,960, of the moneys, property, and funds belonging to the Union National Bank, which said moneys, property, and funds were, at the time of such taking and abstraction, in the immediate possession, custody, and control of the said Harvey D. Apgar as cashier of the said Union National Bank. And, thereupon, your petitioner is advised, and upon which advice avers the fact to be, that the said Harvey D. Apgar converted the aforesaid $23,433.65, $4,800, $1,325.78, $3,207.92, $3,250,

$2,500, $2,314.50, $876.95, $17,960 to his own use; and petitioner is advised and therefore alleges that the act and acts of the said Harvey D. Apgar, as herein above related and set forth, with respect to the said transaction. amounted to embezzlement or larceny of the said money and property, and that, as a result and consequence of the act and acts of the said Harvey D. Apgar amounting to embezzlement, the said Union National Bank sustained a pecuniary loss to the amount of the aforesaid sums of $23,433.65, $4,800, $1,325.57, $3,207.92, $3,250, $2,500, $2,314.50, $876.95, $17,960. by reason of the fraud and dishonesty of the said Harvey D. Apgar, in connection with the duties of his office and position, amounting to embezzlement, and which said acts of fraud and dishonesty amounting to embezzlement were committed during the continuance of the renewals of the aforesaid bond No. 302933–7."

[2] The embezzlement charged is that covered by section 5209, U. S. R. S. (U. S. Comp. St. 1916, § 9772), which provides:

"Any * * * cashier [of a national bank], * * * who embezzles, abstracts or willfully misapplies any of the moneys, funds, or credits of the association * * * shall be imprisoned not less than five years nor more than ten."

[3] And in construing this section it was held in United States v. Harper (C. C.) 33 Fed. 471:

"The crime of embezzlement from a national bank by an officer, clerk, or agent, within Revised Statutes, 5209, involves two general elements; one a breach of trust or duty with respect to moneys, funds, or credits of the bank embezzled. which must have been lawfully in the custody or possession of the accused by virtue of his office or employment. although such possession might not have been exclusive of that of other officers, clerks, or agent; and, second, wrongful appropriation of such funds, moneys, or credits to his own use with intent to injure or defraud the association or others.

"The intent to injure or defraud need not willfully have been the object or purpose with which the act was done; but it is sufficient if the natural and necessary effect of the act was to injure or defraud the bank or others, and it was willfully and intentionally done."

[8] The petition is not phrased in the technical language which would have been used in an indictment or bill of information charging Apgar with embezzlement or larceny; but the use of such language was not necessary in a civil suit. In the petition he is charged with having taken and abstracted from the bank certain sums aggregating nearly $60,000, which were in his custody, which he converted to his own use; and which taking amounted to embezzlement or larceny on his part.

There was no error in overruling the exception.

[9] We are also of the opinion that the court correctly held that Apgar had committed acts of fraud and dishonesty amounting to embezzlement while serving as cashier of the bank.

The evidence shows that H. D. Apgar was a stockholder and the cashier of the plaintiff bank; was one of its executive officers, a member of the board of directors, and a member of the discount board. He was also a stockholder or officer of several insolvent concerns, which he knew to be insolvent. It also shows that he overdrew his own account, and permitted the several concerns with which he and members of his family were connected to do the same thing. He indorsed the notes of these concerns, and he discounted his own notes and the notes of said companies without proper or adequate securities. He borrowed a mortgage note for a few days so as to attach it temporarily to one of his own, so as to have his note discounted. He abstracted a bill of lading which was attached to a draft for collection, and gave it to the consignee, one of the companies with which he was connected, without collecting the draft. These many misappropriations were done by Apgar on his own initiative, and not "in obedience to, or in pursuance of, any instructions or authorization received by him from his employer or any superior officer." They were not errors of judgment, or bona fide mistakes, or the injudicious exercise of discretion in matters where he had been vested with discretion, or by instruction or by the rules and regulations of his employer.

The other officers of the bank were not con-

sulted by him in making these misappropria- tions; they did not authorize them, and they had no knowledge of the existence thereof. Some of the officers testified that at their monthly meetings Apgar, or his assistant, read aloud all the discounts and loans which had been made during the preceding month; but they did not learn of them until after they had been granted by the cashier, and they did not know whether they were re- newals or not, or whether the amounts had been increased or not from month to month. They approved of what had been done, with- out informing themselves of the true condi- tion of affairs.

This failure of duty on the part of the remaining directors of a national bank can- not excuse the conversion or embezzlement of funds of the bank by the cashier. Having taken the funds of the bank for the use of himself and others, without the knowledge or consent of the bank officials, Apgar was guilty of the crimes charged in the petition.

[4] The embezzlement or "misapplication of the funds of a national bank by an officer without the knowledge or consent of the bank, * * * is not changed, as to its criminal character, by the fact that the act subsequently became known to the officers of the bank, and that they impliedly consented thereto, by taking no action in regard to it." Rieger v. United States, 107 Fed. 916, 47 C. C. A. 61.

"The intent to injure or defraud the bank within the meaning of the section does not necessarily involve malice or ill will toward the bank, for the law presumes that a per- son intends the necessary and natural con- sequences of his acts, and it is sufficient that the wrongful or fraudulent act will neces- sarily or actually injure or defraud the bank." Agnew v. United States, 165 U. S. 36, 17 Sup. Ct. 235, 41 L. Ed. 624; United States v. Youtsey (C. C.) 91 Fed. 864.

[5, 6] In the course of a well-considered opinion, the district judge thoroughly re- viewed the evidence on each transaction charged in the petition, and he said, in part:

"The bank was almost wholly under the di- rection of Apgar.

"At the organization of the national bank, March 4, 1912, it took over the assets and property of the Union Bank & Trust Com- pany. Among the bills receivable was an in- debtedness by the Vollmer-Apgar Auto Com- pany, represented by notes amounting to $8,- 904, and on October 8, 1913, the checking ac- count of said firm showed an overdraft of $4,749.24. To cover this overdraft a note for $5,066.65 was executed by said firm and in- dorsed to H. D. Apgar and M. P. Vollmer, and the net proceeds of $5,000 placed to its credit. Thereafter, through a series of overdrafts and renewals, the principal and interest of said in- debtedness increased to the sum of $23,433.65 at the date the bank was closed. In addition to the sum mentioned, on February 11, 1915, less than four months prior to the bank's fail- ure, a note of L. T. Apgar, indorsed by the cashier, was discounted with the bank, and its proceeds, $2,500, passed to this firm's credit also, making the total amount of the bank's funds received by the auto company, with ac- crued interest which had been added to the principal, the sum of $25,966.95. When the firm first began doing business with the bank it was known as the Vollmer-Apgar Auto Com- pany, but some time during the latter part of December, 1913, or first of January, 1914, H. D. and L. T. Apgar bought out the interest of M. P. Vollmer, and it became known as the Apgar Auto Company, composed of H. D. and L. T. Apgar. The new firm assumed all the old firm's debts, including the notes held by the plaintiff bank, and M. P. Vollmer was re- leased from his indorsements thereon; all pa- per being indorsed instead by the two Apgars. The firm was a commercial partnership, and, besides, the individual members were indorsers on all its paper at the bank. L. T. Apgar was without commercial standing, save such as was enjoyed by virtue of his interest in the firm; he having no other property. Since the bank's failure, the Apgar Auto Company's affairs have been liquidated and less than $2,000 has been realized therefrom.

"Concurrently with the accumulation of the above indebtedness, the Louisiana Wagon & Woodstock Manufacturing Company, a corpo- ration in which H. D. Apgar was a stockhold- er, by a similar system of overdrafts and re- newals, the overdrafts being covered by notes, became indebted to the plaintiff bank in a large sum, amounting at the date of its failure to more than $60,000. Up to the time it reached $20,000, he was an indorser thereon with other officers and stockholders of said company, but some time about the latter part of 1913 he ceased to indorse its paper, though by private

understanding with other indorsers he remained liable therefor.

"In addition to the indebtedness due the bank which accrued as above set forth, the said H. D. Apgar was, on or about the 1st of December, 1913, indorser on paper of the Monroe Stationery Company, a corporation managed by another son, P. F. Apgar, in a sum in excess of $11,000. On December 18, 1913, the said H. D. Apgar placed to the credit of his personal account as the proceeds of two notes secured by mortgage of one Luther M. Fairbanks a net amount of $17,960. The maturities of these notes were April 1, 1921 and 1923, respectively. He then drew against this deposit and took up the Monroe Stationery Company note, amounting to $11,200, and subsequently withdrew the remainder of the deposit on his personal check. It will be observed that these notes, which were for equal amounts, had about 7½ and 9½ years respectively to run before maturity, and for all practical purposes it was merely shifting the debt with an increase of more than $6,500. The whole of the purchase price of the property which had been bought by Fairbanks was approximately $100,000, on which an initial cash payment of $2,500 had been made. Three or four years before, H. D. Apgar and G. P. Stubbs, who were stockholders of the Central Immigration Real Estate & Loan Company, had bought the same property for approximately one-third of that amount. During 1914 and 1915, H. D. Apgar also owed the Bank of Commerce, of St. Louis, or some one else to whom the indebtedness was shifted during that time, the sum of $6,500, and a like sum of $6,500 to the Commercial National Bank of New Orleans. He also owed another bank, the name of which does not appear in the record, a further sum of $1,000 to $2,000, besides another note due the Union National Bank for $5,000, on which W. R. Mitchell and Percy Sandel were indorsers. He was also indorser on another note held by the last-mentioned bank, made by the Central Immigration Real Estate & Loan Company amounting to $7,958.64. He was also indorser on another note for $1,500 made by other persons for some railroad project, but which was later absorbed by receiver's certificates of the Arkansas, Louisiana & Gulf Railway Company. To this should also be added the sum of $3,207.92, consisting of an overdraft existing in his account on February 18, 1915, and which was taken up with a part of the proceeds of a certain note of W. B. Clarke for $4,800 discounted on that date.

"Thus the liabilities of H. D. Apgar, both primary and secondary, had risen at the date of the failure of the bank, to the huge amount of approximately $120,000. This, of course, takes into consideration the Fairbanks notes which he had discounted with the bank.

"Against this, as best we can gather from the record, he owned the following property: 166 shares of Union National Bank stock of the par value of $100 per share, but with such real value during this time as the condition of the bank gave it; an interest in the Central Immigration Real Estate & Loan Company, amounting on the face of the papers to approximately $25,000, but with such real value as the circumstances with reference to the lands sold to Fairbanks mentioned above justified; also some stock in the Central Savings Bank & Trust Company, the exact amount of which does not appear in the record; some stock in the Louisiana Wagon & Woodstock Manufacturing Company, the value of which also fails to appear in the record, but from the evidence of its large indebtedness to the bank still unpaid would seem to have been small, if anything; possibly a small amount of stock in the Ouachita Abstract & Title Guaranty Company; his half interest in the Apgar Auto Company, whatever that may be worth, considering that its assets under liquidation realized less than $2,000; and his home, valued at from $5,000 to $6,000. From this it will be seen that the value of his assets is very indefinite, but the witness M. W. Haas, who was assistant cashier under Apgar, places a net value upon his property of approximately $25,000 to $30,000. He seemed to be reasonably familiar with Mr. Apgar's holdings. However, if this was not correct, the principal of defendant in the bond, H. D. Apgar, was present in court, consulting with counsel for defendant, and could easily have cleared the matter up. Not having done so, we conclude that the figures named were at least approximately correct.

"There were, of course, other persons on some of the obligations mentioned above besides Apgar, but, taking all things into consideration, we think the record reasonably establishes that he was insolvent from about the 1st of January, 1914. At least, his affairs were in such shape that he, as a reasonably prudent banker, should have known, and did know, that he was not entitled to any further loans or advances from the bank of which he was cashier without giving proper security or collaterals. This is especially true by virtue of the knowledge which he had of the condition of the affairs of the various concerns he was interested in, to whom and on whose paper he advanced the bank's money.

"Having thus concluded that he was insolvent on or about January 1, 1914, it becomes important to determine whether or not he had any reasonable expectation of meeting or paying the various obligations on which he received and used the bank's funds. In other words, it is the intention with which the acts were done that must determine their character, i. e., whether criminal or not. * * * It would not amount to embezzlement, or any other crime, if Apgar overdrew his account, or, through others, that of firms or companies in which he was interested, provided he or they had a reasonable expectation of being able to pay, such as assets or property out of which payment could be had. And the same applies

to loans made to himself or concerns in which he was interested. On the other hand, if neither he nor they had any such resources, and overdrew their accounts in large amounts, in the manner stated, or he loaned himself and them large sums of money without security, he being the controlling power who effected such dispositions of the bank's money for his own and their benefit, then in law and in fact he was guilty of embezzlement, because of the implied or presumed intention to injure or defraud. United States v. Breese (D. C.) 131 Fed. 915; United States v. Heinze (C. C.) 161 Fed. 425. * * *

"Not only must Apgar be held to a knowledge of the condition of his affairs and those of the firms in which he was interested who received the bank's funds, but, as an evidence of his knowledge and intent, he persisted and insisted on paying the checks of the auto firm when it had no funds, notwithstanding its large and growing indebtedness, and in the face of objections and remonstrances on the part of the assistant cashier and other employés in the bank. They would turn down checks, and he would subsequently order them paid, or pay them himself. None of the notes representing this large indebtedness on the part of the auto company were ever made in the customary manner of applications regularly passed on and loans made, except the one made by L. T. Apgar for $2,500, but were made by overdrafts. Neither were any collaterals ever given, except as later herein mentioned, and the only payments ever made on principal or interest was $150 at one time, and $1,100 at another. During all this time, 100 shares of his Union National Bank stock was pledged for more than its par value; his Central Immigration Real Estate & Loan stock was also pledged for more than its par value, and this, together with the Fairbanks notes absorbed in December, 1913, had about consumed his interest in that company; his Central Savings Bank & Trust Company stock was pledged to the plaintiff bank; the Apgar Auto Company was insolvent; and the Louisiana Wagon & Woodstock Company's affairs were heavily involved, if it were not insolvent also. Under such circumstances, can it be said that he was acting in good faith? This question can be more satisfactorily answered after consideration of the evidence in support of the other items of complaint in the petition.

"It was not necessary that a benefit accruing directly to Apgar should be shown.

" 'The evidence must show a withdrawal of the funds. a conversion of them to the use of the defendant or some one other than the bank. The evidence need not show personal benefit to the defendant.' Dow v. United States, 82 Fed. 904 [27 C. C. A. 140]; United States v. Kenney (C. C.) 90 Fed. 257; Breese v. United States, 106 Fed. 680 [45 C. C. A. 535]."

Each item of the petition was considered by the judge with similar results in each in-

stance, and in discussing the overdrafts of Apgar he correctly cited the law to be:

"An overdraft on a national bank may be legal or criminal according to the intent of the person committing it, inferred from the surrounding circumstances shown by the evidence. United States v. Heinze [C. C.] 161 Fed. 425.

"We have concluded that the overdraft was made with the intent to injure or defraud. * * *

"What the defendant did was to draw checks and pay them out of the funds of the bank, of which he was in lawful possession, when he had none to his individual credit. It was not necessary that his possession and control of the funds should have been exclusive.

" 'If his position and employment gave the defendant a superior or a joint and concurrent possession with subordinate employés or agents of the bank, that would be sufficient to place him in such lawful possession as would enable him to commit the crime of embezzlement in relation to assets of the bank so committed to his keeping.' United States v. Harper (C. C.) 33 Fed. 474–476.

"The fact that the checks were regularly drawn and charged in his account with the bank can make little difference, if the funds were used with the legal intent to injure or defraud.

"As evidence that overdrafts on the bank by its president were made with intent to abstract or misapply its funds, it may be shown that at the time of the overdrafts it was hopelessly insolvent; that this was due to its assets being notes of wholly irresponsible persons; and that these notes had been used by the president in connivance with the cashier who was the director and another director to give him fictitious credit.

" 'The acts and intent of the president * * * in obtaining money * * * for worthless securities being such as to make him guilty of embezzlement, abstraction, or willful misapplication of its funds, it is immaterial that his acts were committed, sanctioned, or ratified by the other officers of the bank, with knowledge of the facts.' Breese v. United States, 106 Fed. 680 [45 C. C. A. 535].

"We therefore conclude that the cashier embezzled the bank's funds to the extent of $3,207.92 in connection with the W. B. Clarke note, and that plaintiff is entitled to recover against the surety to that extent.

"Apgar was, by resolution of the board of directors of the bank passed December 3, 1913, authorized to furnish collaterals to relieve himself on indorsements for considerable amounts then held by the bank. On December 18, 1913, instead of furnishing said collaterals, he discounted two mortgage notes of Luther M. Fairbanks for $8,980, each maturing April 1, 1921, and April 1, 1923, respectively, and deposited the proceeds, $17,960, to his personal account. He then drew a check against this account for $11,200 and took up a note of the

Monroe Stationery Company, a corporation managed by another son, P. F. Apgar, and on which he was indorser for that amount. The remainder of the sum so deposited was used by him for his personal benefit. This was done without further consulting any one of the officers of the bank, except that he informed the assistant cashier, when approached about the matter, that he was relieving himself of certain of his indorsements. The precarious character of this paper has been indicated heretofore. To say the least, no discreet banker would have for a moment considered the proposition to discount those notes as was done. $17,960 of the bank's funds were thereby tied up for a long period of years. Even conceding that the notes were perfectly good, he did not have the right, either morally or legally, to so appropriate the bank's funds. As an experienced banker, he was necessarily charged with knowledge of this fact, and to take its money under such circumstances, without consulting the other officers and directors of the bank, when he was personally receiving the benefit of his position and connection with the bank, was equivalent to embezzlement, even if he had not known the uncertain value of the paper, and regardless of his own financial position. He attempted thereby to relieve himself of $11,200 of indebtedness to the bank by substituting Fairbanks in his stead with such security as was afforded by the mortgage. The result was to injure, and, under all circumstances, the bank was defrauded, either by virtue of a loss of the Monroe Stationery note for $11,200, or the difference between the real value of the Fairbanks notes and what Apgar really received. The evidence shows that the notes were worth, on account of the mortgage, about $6,000, and that outside of this Fairbanks, as a resident of another state, was not in such shape that the money could be made out of him. We think that the bank, under the better view, lost the difference between the real value of the notes, $6,000, and $17,960, the amount received by Apgar under the discount.. The authorities cited heretofore apply with equal force to this transaction, and the bank is entitled to recover on the bond. The remarkable part of it is that the matter stood from December 18, 1913, until the bank was closed on June 9, 1915, about a year and a half, without any protest coming from the board of directors or other officers of the bank. The only way that it can be accounted for is that some of these officers were in like circumstances with reference to the bank, that is, large debtors, and with the irregular and perfunctory reading and supervision of the bank's loans it was overlooked. Some of the officials have so testified.

"The failure of this bank was brought about largely through the acts of the cashier and those with whom he was associated or connected in business. The Vollmer-Apgar Auto Company and the Apgar Auto Company and L. T. Apgar, for the use and benefit of this firm in which and for which the cashier was interested as a commercial partner and indorser of its paper, received over $25,000 of the bank's funds, and an additional $2,314.50 by his surrender to it of the bill of lading for cars in the Bernstein Bros. transaction, and for which the bank is liable as bailee. What has been said about other transactions and the law applicable thereto also governs this indebtedness. The overdrawing of that firm's account in the circumstances, brought about by his orders and directions, was in law embezzlement on his part of its 'moneys and funds.'

"There are many other circumstances and matters in the record received on the question of good faith and intent, among which was the proof of forgery of the indorsement of G. P. Stubbs on the note of the Central Immigration Real Estate & Loan Company for $2,240 in the fall of 1914, the proceeds of which, $2,200, went to his personal account. This and other things speak strong of the financial burdens under which he was laboring, and reflect the intent and purpose with which the accounts were overdrawn and the bank's funds used.

"The sum total of the moneys, funds, credits, etc., of the bank embezzled largely exceeds the amount of the bond, and the plaintiff is entitled to judgment for the entire amount thereof, that is, the sum of $10,000."

The People's Investment Company, Incorporated, has been substituted for plaintiff, and the judgment appealed from is affirmed in favor of said company.

O'NIELL, J., concurs in the decree.